[Cite as *Weaner & Assocs., L.L.C. v. 369 W. First, L.L.C.*, 2020-Ohio-48.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| WILLIAM E. WEANER & ASSOCIATES, LLC, et al. | : | |
| | : | |
| | : | Appellate Case No. 28399 |
| Plaintiffs-Appellants/Cross-Appellees | : | |
| | : | Trial Court Case No. 2017-CV-255 |
| | : | |
| v. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| 369 WEST FIRST, LLC, et al. | : | |
| | : | |
| Defendants-Appellees/Cross-Appellants | | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 10th day of January, 2020.

. . . . . . . . . .

CRAIG T. MATTHEWS, Atty. Reg. No. 0029215, 320 Regency Ridge Drive, Centerville, Ohio 45459
    Attorney for Plaintiffs-Appellants/Cross-Appellees

T. ANDREW VOLLMAR, Atty. Reg. No. 0064033 and ADAM ARMSTRONG, Atty. Reg. No. 0079178, 40 North Main Street, Suite 2010, Dayton, Ohio 45423
    Attorneys for Defendants-Appellees/Cross-Appellants

. . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} This case is before the court on the appeal of Plaintiffs-Appellants/Cross-Appellees, Shooter Construction Company dba Possert Construction ("Possert") and William Weaner and Associates, LLC ("Servpro"), and the cross-appeal of Defendants-Appellees/Cross-Appellants, Whichard Whichard, NW Fashion, LLC ("NW"), and Olympia Shoppes, LLC ("Olympia").[1]

{¶ 2} Plaintiffs appeal from a judgment denying in part their motion for summary judgment against Defendants; the motion was also granted in part. Specifically, the trial court found Defendants jointly and severally liable for a total of $14,000 toward the payment of $60,143 in attorney fees and/or unpaid interest on an attorney fee judgment that was awarded to Plaintiffs in July 2015. The basis for the judgment was that transfers of this amount by a limited liability company (LLC), 369 West First Street, LLC ("369") to NW and Olympia violated the Ohio Uniform Fraudulent Transfer Act ("UFTA"). Plaintiffs do not appeal from this part of the judgment, but Defendants have cross-appealed, contending that the trial court erred in awarding this amount to Plaintiffs.

{¶ 3} The trial court rejected Plaintiffs' fraudulent transfer claims concerning January 2013 transfers of $100,000 to Whichard and $123,690 to Ashton Limited, LLC ("Ashton"). Ashton was a defendant in the trial court, and like NW and Olympia, was an LLC owned solely by Whichard. The trial court also refused to pierce the corporate veil of 369 and hold Whichard responsible for the attorney fee judgment against 369. Plaintiffs appeal from this part of the trial court judgment as well.

{¶ 4} After considering the evidence, we conclude that the trial court did not err in

---

[1] To avoid confusion, we will use the terms "Plaintiffs" and "Defendants" when referring to the parties collectively.

awarding $14,000 to Plaintiffs. However, there were genuine issues of material fact regarding the piercing of the corporate veil and the transfers to Whichard and Ashton. As a result, the judgment of the trial court will be affirmed in part and reversed in part, and this cause will be remanded to the trial court for further proceedings.

## I. Facts and Course of Proceedings

{¶ 5} Plaintiffs' claims are based on what is now nearly an eleven-year attempt to collect on amounts that 369 owed for work that Plaintiffs performed in 2008. As noted, Whichard was the sole owner of 369, which was formed to purchase property at 369 West First Street, in Dayton, Ohio. In late August 2008, a large rainstorm damaged 369's building. At the time, the building was the only property that 369 owned.

{¶ 6} Servpro is a company that provides water remediation services. Whichard's assistant, Jeanette Hagood, signed a contract with Servpro, agreeing to pay for any amounts that were not covered by insurance immediately upon receipt of an invoice. The contract imposed interest and finance charges at the maximum allowable by law or at 1.5% per month, whichever was less, on accounts that were over 30 days past due. Further, the contract provided that if legal action were brought, Servpro would be entitled to reasonable legal fees and costs of collection, in addition to any other amounts the customer owed. Finally, the contract provided for the filing of mechanics liens. The total charge for Servpro's services was $13,939.04.

{¶ 7} Hagood also signed a contract with Possert for needed property repairs. Although Possert estimated $75,000 in construction costs, only limited repairs were done. Possert's contract, like Servpro's, imposed 1.5% interest due per month on all past-due

invoices. In addition, Possert's contract provided for recovery of reasonable attorney fees and costs. The total cost of Possert's repairs was $9,402.25, which was billed by Possert on November 7, 2008. That same day, Traveler's Insurance had informed both Servpro and Possert that it had denied 369's claim for insurance, and that they would need to individually invoice 369. They did so, but 369 never paid the invoices.

{¶ 8} Both Servpro and Possert filed mechanics' liens against 369's property on West First Street. Subsequently, on December 29, 2008, Whichard signed a general warranty deed, conveying the 369 property to Eufala corporation. Whichard's son, Chad Whichard ("Chad"), who was the managing member of another LLC (Northwest Outparcels, LLC), also signed the warranty deed. According to Whichard, 369 owned a 90% interest in the property, and Northwest owned 10%.

{¶ 9} According to the settlement statement, the purchase price was $300,000, and the cash amount due to the sellers was $226,478.98, based on various settlement charges, including payoff of several mechanics' lien. These liens included $14,103.38 for Possert, $22,612.15 for Servpro, and $28,547.61 to Beerman Realty Company. However, Possert or Servpro were not paid. As a result, Servpro filed suit against 369 in October 2009, seeking $13,939.04, plus interest and reasonable attorney fees. Possert also sued 369 in March 2011, seeking $9,402.25, plus interest and reasonable attorney fees.[2] After the cases were consolidated, a magistrate held a joint two-day trial in November 2012. The magistrate found in favor of Servpro and Possert and awarded

---

[2] Plaintiffs also filed suit against Dayton Hand and Neck Surgeons ("DHNS"), which was renting offices in the property from 369 for $20,000 per month at the time the services were rendered. However, the claims against DHNS were not successful.

the requested amounts, plus interest at the contractual rate of 1.5% from the date of default by 369 (October 21, 2008, and November 7, 2008, respectively).

{¶ 10} The magistrate's April 2013 decision noted that due to the inclusion in the contract of provisions for reasonable attorney fees and costs, the matter of attorney fees would be set for a hearing. April 10, 2013 Amended Magistrate's Decision in Montgomery C.P. No. 2009-CV-9715, pp. 11 and 14-15.[3] In addition, the magistrate stressed that "[t]he Court is well aware of the extensive procedural history of this case." *Id*. at p. 2. Both Plaintiffs and 369 filed objections to the magistrate's decision. In October 2013, the case was transferred to another judge.

{¶ 11} In November 2013, Whichard's attorney, Lemuel Whitsett, offered to settle both claims for $25,000. According to Plaintiff's counsel, the amount of the judgment at that time (prior to the attorney fee award) was $58,601.87. More than five years had elapsed since the work was done on 369. Plaintiff's counsel offered to settle the action for $42,250, but no agreement was reached.

{¶ 12} In April 2014, the trial court issued a decision overruling all the objections to the magistrate's decision. 369 appealed from the decision, but we dismissed the appeal for lack of a final appealable order. *See Weaner & Assocs. v. 369 W. First LLC*, 2d Dist. Montgomery No. 26404 (December 8, 2014).

{¶ 13} Another judge was assigned to the 2009 collection case early in 2015 and held a hearing on attorney fees. In July 2015, the judge awarded Plaintiffs a total of

---

[3] The magistrate's decision has not been filed in this case. *See* Doc. #57, Plaintiff's Motion for Summary Judgment, Ex. B. However, we may also take judicial notice of the dockets and findings in other cases. *See Jagow v. Weinstein*, 2d Dist. Montgomery No. 24309, 2011-Ohio-2683, ¶ 9 and fn.1; *State v. Bevers*, 2d Dist. Montgomery No. 27651, 2018-Ohio-4135, ¶ 13.

$60,143.25 in attorney fees. Following 369's appeal, which raised only the attorney fee issue, we affirmed the trial court's judgment. *See Weaner & Assocs., L.L.C. v. 369 W. First St., L.L.C.*, 2d Dist. Montgomery No. 26792, 2016-Ohio-8077. In rejecting 369's claim that Plaintiffs' recovery should be limited to a contingency amount, we stressed that "limiting plaintiffs' recovery to that amount encourages the precise behavior that occurred in this case: defendant's obfuscation, denial, delay and distraction that turned this rather simple collection case into a six year ordeal." *Id.* at ¶ 34.

**{¶ 14}** Our opinion was issued in December 2016, and no further appeal was taken. Plaintiffs then filed an action on January 1, 2017, against 369 and Whichard, as well as three other LLCs that Whichard owned: Ashton, NW, and Olympia. The complaint alleged violation of the UFTA and also asked the court to pierce the corporate veil. Another extensive course of litigation ensued. In May 2017, the court set a trial for July 23, 2018. In February 2018, Plaintiffs filed a motion for summary judgment on all claims. Defendants then filed a cross-motion for summary judgment in April 2018. However, in late May 2018, 369 filed for bankruptcy and then filed a motion on August 1, 2018, asking the trial court to stay the case until the bankruptcy proceeding was complete.

**{¶ 15}** Although Plaintiffs had dismissed 369 as a party in July 2018 and had opposed a stay, the trial court stayed the action on September 9, 2018. After the bankruptcy case ended in November 2018, the trial court lifted the stay and reactivated the action. Subsequently, in April 2019, the court ruled on Plaintiffs' motion for summary judgment and Defendants' cross-motion for summary judgment.

**{¶ 16}** In its judgment, the court set aside November 2015 transfers from 369 to NW and Olympia, and held Whichard and both entities jointly and severally liable for

payment of $14,000.   However, the court rejected the attempt to set aside transfers from 369 in January 2013 to Whichard and Ashton.   Following the judgment, Plaintiffs filed a notice of appeal, and Defendants cross-appealed.

## II.   Piercing the Corporate Veil

{¶ 17} Plaintiff's First Assignment of Error states that:

> The Trial Court Erred by Granting [Defendants'] Motion for Summary Judgment as to the [Plaintiffs'] Claim Regarding Piercing the Corporate Veil of 369 and Holding [Whichard] Personally Liable for the Debt Owed.

{¶ 18} Under this assignment of error, Plaintiffs contend that the trial court erred in refusing to pierce the corporate veil and hold Whichard responsible for 369's debts. According to Plaintiffs, the trial court failed to use the well-known test for disregarding corporate entities.   They stress that by using this test, the court should have found that 369 was Whichard's alter ego and had no separate mind, will, or existence of its own.

{¶ 19} In its decision, the trial court concluded that there has been little discussion in Ohio case law of how the standards of Ohio corporations apply to Ohio limited liability companies.   The court then rejected the Plaintiffs' claims against Whichard because she did not exercise complete control over 369's operation.   The court also relied on the fact that Whichard used her "personal credit" to pay off the mechanics' liens.

{¶ 20} The law is well-settled concerning the standards that apply to summary judgment decisions.   " 'A trial court may grant a moving party summary judgment pursuant to Civ.R. 56 if there are no genuine issues of material fact remaining to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds

can come to only one conclusion, and that conclusion is adverse to the nonmoving party, who is entitled to have the evidence construed most strongly in his favor.' " *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.), quoting *Smith v. Five Rivers MetroParks*, 134 Ohio App.3d 754, 760, 732 N.E.2d 422 (2d Dist.1999). Due to the nature of summary judgment, we apply a de novo standard of review, which means that we apply the same standards as the trial court. *Id.*

{¶ 21} "A fundamental rule of corporate law is that, normally, shareholders, officers, and directors are not liable for the debts of the corporation. * * * An exception to this rule was developed in equity to protect creditors of a corporation from shareholders who use the corporate entity for criminal or fraudulent purposes." *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 287, 617 N.E.2d 1075 (1993).

{¶ 22} In *Belvedere*, the Supreme Court of Ohio held that "the corporate form may be disregarded and individual shareholders held liable for corporate misdeeds when (1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." *Id.* at 289. The party who seeks to impose individual liability under this theory has the burden of proof. *Zimmerman v. Eagle Mtge. Corp.*, 110 Ohio App.3d 762, 772, 675 N.E.2d 480 (2d Dist.1996).

{¶ 23} Subsequently, the Supreme Court of Ohio accepted a certified conflict

concerning whether *Belvedere* would allow piercing when a shareholder's acts were simply unjust or inequitable, rather than fraudulent or illegal. *Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, ¶ 1. The court rejected this theory. However, the court also stressed that its "pronouncement in *Belvedere* is too limited to protect other potential parties from the wide variety of egregious shareholder misdeeds that may occur. Limiting piercing to cases of fraud or illegal acts protects the established principle of limited liability, but it insulates shareholders when they abuse the corporate form to commit acts that are as objectionable as fraud or illegality. In view of the reality that shareholders could seriously misuse the corporate form and evade personal liability under the second prong as presently worded, we find it necessary to modify the second prong of the *Belvedere* test to allow for piercing in the event that egregious wrongs are committed by shareholders." *Id.* at ¶ 28.

{¶ 24} The court, therefore, held that "to fulfill the second prong of the *Belvedere* test for piercing the corporate veil, the plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act." *Id.* at ¶ 29.

{¶ 25} Contrary to the trial court's impression, numerous Ohio cases have applied the standard in *Belvedere* to limited liability corporations. *See Denny v. Breawick, LLC*, 3d Dist. Hancock No. 5-18-12, 2019-Ohio-2066, ¶ 15 (citing cases from the First, Second, Seventh, Eighth, and Tenth Appellate Districts). The trial court also stressed that LLCs are set up to conduct business in a less formal manner than corporations. *See* Doc. #90, Decision and Entry on Cross-Motions for Summary Judgment, p. 10. However, this was not a limitation expressed in either *Dombrowski* or *Belvedere*. In fact, *Belvedere*

emphasized that "[t]he ease with which close corporations and corporate subsidiaries can be created and the ability to transfer ownership of an existing corporation lead us to believe that corporations formed for legitimate purposes can easily be later used to commit fraud or other wrongs." *Belvedere*, 67 Ohio St.3d at 288, 617 N.E.2d 1075.

{¶ 26} The same comment would apply to LLCs, which are a hybrid of a close corporation and a partnership. *Holdeman v. Epperson*, 2d Dist. Clark No. 2004-CA-49, 2005-Ohio-3750, ¶ 33. Close corporations also resemble partnerships. *Vontz v. Miller*, 2016-Ohio-8477, 111 N.E.3d 452, ¶ 31 (1st Dist.). Both close corporations and LLCs have the advantage, however, of limited liability. *Holdeman* at ¶ 33; *Vontz* at ¶ 33. We further noted in *Holdeman* that because an LLC has "some attributes of a corporation" and also has "some partnership attributes, the logical approach would be to use rules typically applied to these entities." *Holdeman* at ¶ 34.

{¶ 27} With these points in mind, we will consider whether summary judgment was appropriate on the question of piercing the corporate veil.

## A.   Alter Ego

{¶ 28} "The first prong of the *Belvedere* test 'is a concise statement of the alter ego doctrine; to succeed a plaintiff must show that the individual and the corporation are fundamentally indistinguishable.' " *State ex rel. DeWine v. S & R Recycling, Inc.*, 195 Ohio App.3d 744, 2011-Ohio-3371, 961 N.E.2d 1153, ¶ 30 (7th Dist.), quoting *Belvedere* at 288.   A party's sole control of a company is not sufficient to establish that an individual is the alter ego of a company. *Springfield v. Palco Invest. Co.*, 2013-Ohio-2348, 992 N.E.2d 1194, ¶ 83 (2d Dist.)   Instead, to decide if a corporation [or LCC, as here,] "is an

individual's alter ego, Ohio appellate courts consider various factors, such as (1) whether corporate formalities were observed, (2) whether corporate records were kept, (3) whether corporate funds were commingled with personal funds, (4) whether corporate property was used for a personal purpose, and (5) gross undercapitalization." *Id.* at ¶ 84, citing *My Father's House No. 1 v. McCardle*, 2013-Ohio-420, 986 N.E.2d 1081, ¶ 28 (3d Dist.) (using factors 1-4) and *DeCaprio v. Gas & Oil, Inc.*, 9th Dist. Summit No. 26140, 2012-Ohio-5866, ¶ 14 (using factors 1-5).

{¶ 29} Courts have also considered other factors, including "insolvency at the time of the disputed act"; whether "the individual held himself out as personally liable for certain corporate obligations"; "the entity's inability to pay debts due to high salaries or loans to shareholders"; "commingling of individual and entity funds"; "lack of corporate records, especially regarding claimed loans to or from the entity to be pierced"; "common office space"; and "the degree of domination by the person to be held liable, *e.g.* where the corporation was a mere facade for the operations of the dominant shareholders." *Premier Therapy, LLC v. Childs*, 2016-Ohio-7934, 75 N.E.3d 692, ¶ 84 (7th Dist.). These lists are not exhaustive, nor are the factors mandatory considerations. *Id.* at ¶ 84-85.

{¶ 30} Under the standard for assessing directed verdicts, which is the same for summary judgment motions, reviewing courts consider " 'only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party.' " *Id.* at ¶ 62, quoting *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 3. *See also Knop v. Toledo*, 107 Ohio App.3d 449, 453, 669 N.E.2d 27 (6th Dist.1995) (the same standard applies to both summary judgments and directed verdicts). Therefore, the issue here is not whether Plaintiffs will

prevail on their claim of piercing the corporate veil, but whether any substantive, probative evidence existed in Plaintiffs' favor on this issue.

{¶ 31} After applying the factors, we conclude there is substantive, probative evidence that Whichard was the alter ego of 369. Whichard was the sole member of 369, which was created to buy the property at 369 West First Street in Dayton, Ohio. *See* Doc. #57, Ex. C, Deposition of Angela Whichard, pp. 15-16. Whichard also had full control and authority over 369. *Id.* at p. 27. In addition to NW, Olympia, Ashton, and 369, Whichard was a member or shareholder of other LLCs and corporations, including Branson Commercial Properties, LLC, in Branson, Missouri; Georgetown Village Shoppes in Georgetown, Kentucky; Windsor Richland Mall, LP, which was formed in Texas; Angela Whichard, a Nevada corporation; AT100, LLC, a Nevada LLC; Whichard Family Holdings; and OKO, LLC, an Oklahoma LLC. *Id.* at pp. 25-26, 71, and 101.

{¶ 32} During its life as an LLC, 369 owned three properties: (1) the 369 building in Dayton, Ohio, which was purchased in 2007 and was sold in January 2009; (2) a Pearl Road property in Cleveland, Ohio, which was purchased in 2012 and sold in August 2013; and a Boaz, Alabama property, which was purchased in December 2012 and sold in January 2013. Whichard Affidavit at ¶ 3, 10, and 11; Whichard Affidavit, Ex. A-2 and Ex. A-5, pp. 5 and 6. After the August 2013 sale of the Pearl Road property, 369 owned no other properties and did not earn any money.

{¶ 33} 369 did not have any employees. Hagood assisted Whichard with 369, but she was Whichard's personal assistant and was paid by Whichard, not 369. Whichard Deposition at pp. 30-31 and 34.

{¶ 34} During her deposition, Whichard presented no evidence that corporate

formalities were observed, nor did she have any idea where corporate records might be kept. Later, in opposing summary judgment, Whichard did produce documents indicating that 369 was registered with the Ohio Secretary of State and also produced a general ledger for 369 from May 2012 through August 2016. However, Whichard did not attach any other documents indicating that formalities were observed, including holding meetings and keeping minutes, and she did not provide any evidence like promissory notes or other loan documents to explain or substantiate the terms under which 369 gave money to other entities or allegedly borrowed from other entities.[4] Additionally, no explanation was ever offered as to what happened to the $300,000 that 369 received when it sold the Dayton property in January 2009.

{¶ 35} As to mingling corporate and personal money, the evidence indicates that this occurred in many instances. As an initial point, Whichard stated that as a sole owner of an LLC, she could take money out of the LLC whenever she needed it; she could also put the money in another LLC, or she could use it for personal matters, like real estate taxes. Whichard Deposition at pp. 96-97.

{¶ 36} As an example of mingling corporate and personal money, the evidence indicates that between 2012 and 2016, 369 paid a total of $26,351.97 in expenses on a 2011 Ford Ranger truck that was titled in 369's name, but was kept by Whichard for her

---

[4] For example, during her deposition, Whichard discussed Ex. G, a check written on an account in the name of Whichard Family Holdings, LLC. The check was dated September 11, 2012, and was paid to the order of 369 West First. The amount of the check was $8,224.25 and indicated it was for an elevator. Whichard Deposition at p. 72. However, there was no elevator expense for the 369 building in September 2012, as it had been sold several years earlier. Whichard did not present any documents in connection with summary judgment that would substantiate this alleged loan or other transactions that appear questionable on their face.

personal use. *See* Whichard Affidavit Ex. A-5 at p. 17. Although Whichard claimed the truck could be driven to Cleveland if needed (the location of the Pearl Road property that 369 owned from around May 2012 through August 2013), there is no evidence that it was ever used for that property or for the only other property 369 owned – a property in Boaz, Alabama that was owned for a very short period of time in late 2012 to early 2013. Furthermore, 369 did not own *any* property after August 2013, nor is there any indication that it did any business thereafter.

{¶ 37} Whichard's home was located in North Carolina, and she stated that the truck was used for whatever she wanted, or by anyone who came by the house and wanted to use it; it was a "community truck." Whichard Deposition at pp. 92-93. The expenses 369 paid for the truck included car payments, car insurance payments, and license plates for something that was for Whichard's personal use, particularly after August 2013. *See* Ex. A-5.

{¶ 38} In other examples of co-mingling, Whichard used money from 369 to pay expenses of other LLCs she owned, with no evidence that any of these entities were obligated to pay the money back. According to the evidence, 369 purchased a property in Boaz, Alabama, on December 27, 2012, for $25,000. The property was sold to 369 by the Boaz Downtown Redevelopment Authority. *See* Whichard Affidavit at ¶ 11 and Ex. A-2 attached to the affidavit. According to Whichard's affidavit and the attached documents, 369 sold the same property to VFFO Boaz Opportunity, LLC for $633,000 in January 2013. *Id.* at Ex. A-2. $411,798 was then deposited into 369's checking account on January 18, 2013. *Id.* at ¶ 11 and Ex. A-5 at p. 3.

{¶ 39} The oddities in this transaction abound. As a preliminary point, Ex. A-2

indicates that Whichard signed a deed transferring the property to VFFO on December 26, 2012 – *before* the property was deeded to her. The deed was then not filed until April 11, 2013, several months *after* the $411,798 was deposited into 369's account. Furthermore, the difference between the low purchase price and the very high selling price is inexplicable – and Whichard offered nothing to explain this anomaly. She also did not explain why only $411,798 was deposited, rather than the additional $196,202 that would have resulted from the sale ($633,000 minus $25,000 equals 608,000. $608,000 minus $411,798 equals $196,202). Legitimate explanations may have existed, at least for the difference between the sales price and the amount deposited, but there appears to be no rational explanation for the significant increase in the sales price in less than a month.

{¶ 40} More importantly, after the money from this sale was deposited, Whichard took a member's draw of $100,000. During her deposition, which was taken on August 4, 2016, Whichard stated that she "did not know" why she would have paid herself $100,000 in January 2013. Whichard Deposition at pp. 86-87. However, in her summary judgment affidavit, which was signed on April 16, 2018, Whichard stated that she had taken an owner's draw of $100,000 "[i]n good faith, after the sale of the Boaz property and in consideration of the personal risk I accepted in making this purchase, including my personal guarantee of the loan." Whichard Affidavit at ¶ 11. These statements, made on separate dates, are irreconcilable.

{¶ 41} Moreover, no documents were submitted to substantiate that Whichard personally guaranteed a loan in connection with this purchase. However, even if she had done so, the risk involved in a $25,000 loan that was satisfied by a sale less than a

month later in an amount more than 25 times the loan amount is hardly a risk – particularly where the property was conveyed to the purchaser *prior* to the date when the seller received its own deed to the property.

{¶ 42} 369's ledger also indicates a deposit of $107,401.25 on August 9, 2013 from the sale of 369's remaining property, the Pearl Road property in Cleveland, Ohio. On August 28, 2013, Whichard took another $100,000 in a member's draw. In her affidavit, Whichard again claimed that she took this draw in consideration of the risk she took in making this purchase, including her personal guarantee of the loan. No documents were offered to support this assertion.

{¶ 43} In its decision, the trial court made numerous references to the fact that Whichard personally guaranteed loans. *See* Doc. #90 at p. 6 (referencing "statements" in Defendants' memorandum); p. 7 (referencing the fact that Whichard acquired and sold the Boaz and Pearl Road properties with contributions from her other companies and her personal guarantee); p. 8 (referring to Ex. A-3, an open-end mortgage); and p. 10 (concerning piercing the corporate veil, that Whichard used her "personal credit standing to secure the money to pay off the mechanics liens").

{¶ 44} In their summary judgment motion, Defendants claimed that 369 borrowed money to purchase the Boaz and Pearl Road properties, that the loans were private loans, and that in the case of the Pearl Road loan, a mortgage secured the property. Doc. #63 at p. 6, citing Whichard Affidavit at ¶ 10-11. In the same discussion, and again citing to ¶ 10-11 of Whichard's affidavit, Defendants asserted that the loan terms required Whichard to personally guarantee the loans. *Id.*

{¶ 45} Defendants did not submit any loan documents showing such terms, and

Whichard did not make any such assertions in her deposition. In her affidavit, Whichard did state that she had to contribute funds and personally guarantee the loan used to finance the Pearl Road property. As proof, Whichard relied on a copy of the mortgage, which was attached to her affidavit. *See* Doc. #63, Whichard Affidavit at ¶ 10.

**{¶ 46}** However, the attached mortgage, Ex. A-3, contradicts Whichard's affidavit, the statements that Defendants made in their memorandum, and the trial court's reliance on Whichard's personal guarantees. Ex. A-3 was an open-end mortgage filed on May 13, 2013 in Cuyahoga County, Ohio. Whichard signed this mortgage the same day, as a member of 369. *Id.* at p. 3. This was *after* the Boaz property had been purchased and sold. It was also *after* the Pearl Road property had been purchased, but was a few months before it was sold in August 2013. Therefore, this mortgage had nothing to do with the financing of either property.

**{¶ 47}** More importantly, Whichard was not the guarantor on the mortgage. 369 was the mortgagor and granted a North Carolina LLC, Par Enterprises of Pitt County, LLC, an open-end mortgage on the Pearl Road property, which 369 owned at the time.[5] The mortgage secured two things. First, it secured a $1,200,000 promissory note between OKO Enterprises and Par Enterprises, so that OKO could purchase property in Oklahoma. During her deposition, Whichard indicated she had another LLC, OKO Properties, LLC, which was located in Oklahoma. Whichard Deposition at p. 101.

**{¶ 48}** The second provision in the mortgage secured a "future advance deed of trust" in the amount of $500,000 between Whichard, an individual residing in North

---

[5] No evidence was presented about the ownership of Par Enterprises. The fact that it was a North Carolina LLC raises the possibility that it was an LLC belonging to Whichard's family.

Carolina, and Par Enterprises. Under this provision, Par Enterprises agreed to advance money to Whichard, so long as the outstanding balance did not exceed more than $500,000. Ex. A-3 at pp. 1-2. The total secured amount for both Whichard and OKO was $700,000. 369 also agreed that if either OKO or Whichard defaulted under the mortgage, Par Enterprises would have all rights and remedies for default under the mortgage, "just as if Mortgagor [369] had executed the Promissory Note and Future Advance Deed of Trust Note identified herein." *Id.* at p. 2.

{¶ 49} In Ohio, "[a]n open-end mortgage is one which secures unpaid balances of loan advances made after the mortgage is delivered for record, to the extent that the total unpaid loan indebtedness, exclusive of interest, does not exceed the maximum amount of loan indebtedness stated on the mortgage." *Jones v. Jones,* 39 Ohio App.3d 73, 74, 529 N.E.2d 475 (10th Dist.1987), citing R.C. 5301.232(A). Thus, Whichard did not personally obligate herself for 369's purchase of either the Boaz or the Pearl Road property. To the contrary, she obligated 369 on May 13, 2013, to pay for loans up to $700,000 if she or her Oklahoma LLC, OKO, defaulted. At the time this mortgage was filed, 369's ledger showed a balance of only $88,219.36. *See* Ex. A-5 at p. 6. The mortgage, therefore, may have rendered 369 insolvent, as noted in fn. 11, below.

{¶ 50} Furthermore, while Whichard stated at ¶ 11 of her affidavit that she personally guaranteed the "loan" on the Boaz property, there were no documents to support that. As noted, the purchase price was only $25,000 and the property was sold less than a month later for $633,000. In addition, there was no evidence that payment of $123,690 to Ashton in January 2013 was to compensate Ashton for loans made to 369. Whichard did not make a statement to this effect in her deposition. To the contrary, she

noted that the ledger indicated that the $123,690 payment to Ashton was to "cover bills." Whichard Deposition at p. 87.

{¶ 51} Moreover, after both the Boaz and Pearl Road property sales, Whichard continued to co-mingle property. 369 paid Ashton $123,690 on January 23, 2013 to "cover bills." No evidence was submitted to indicate that 369 received a promissory note or other consideration for this loan. There was also no evidence in the ledger that Ashton ever loaned or paid such a sum to 369.

{¶ 52} 369's ledger also shows other large amounts of money being paid between 2013 and 2016 for expenses incurred by Whichard's other interests or on behalf of other entities, without corresponding proof of promissory notes or any evidence of obligation to 369. *See* February 6, 2013 payment of $23,154.84 to Wake County Revenue, for Beacon Plaza property taxes; February 8, 2013 payment of $636.75 to Wake County Revenue, for Beacon Plaza property taxes; February 15, 2013 payment of $24,949.20 for Randolph Springs Mall Taxes; May 15, 2013 payment of $8,752 to Bill McGhee Insurance for new polices[6]; August 13, 2013 payment of $11,257.93 to Wake County Revenue for taxes[7]; August 13, 2014 payment of $12,058.73 to Wake County Revenue; November 3, 2015 payment of $8,000 to NW to cover payables; November 24, 2015 payment of $6,000 to Olympia to cover expenses; and December 9, 2015 payment of $12,718 to Wake County Revenue. Whichard Affidavit, Ex. A-5, pp. 3, 4, 6, and 7.

---

[6] 369 did not own any property and was not conducting any business at the time of this insurance payment, so there would have been no need for "new" insurance policies.

[7] Payments to Wake County, North Carolina would have been for property taxes. Whichard indicated that payments to Wake County would have been for taxes she owed. Whichard Deposition at pp. 94-96. Again, at the time, 369 did not own any property, nor did 369 ever own property in North Carolina.

{¶ 53} These payments totaled $107,527.45. The distributions to Whichard totaled at least $214,000 (the amounts to NW and Olympia were also classified as member draws). Ashton received another $123,690. Without even considering the payments for Whichard's automobile expenses, these other payments and distributions totaled $445,217.45.

{¶ 54} Under the circumstances, there was substantive probative evidence to support a finding against Whichard vis-à-vis the "alter ego" doctrine pursuant to factors one through four in *Palco*. *Palco Invest. Co.*, 2013-Ohio-2348, 992 N.E.2d 1194, at ¶ 84. Gross undercapitalization also existed, particularly in light of the $700,000 encumbrance in May 2013 (*Palco* factor 5). Additional factors existed, including "insolvency at the time of the disputed act"; "the entity's inability to pay debts due to high salaries or loans to shareholders"; "commingling of individual and entity funds"; and "lack of corporate records, especially regarding claimed loans to or from the entity to be pierced." *Premier Therapy, LLC*, 2016-Ohio-7934, 75 N.E.3d 692, at ¶ 84.

## B.   Commission of Unlawful Act

{¶ 55} To establish "the second prong of the *Belvedere* test for piercing the corporate veil, the plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act." *Dombroski*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, at ¶ 29. Disposing of assets in violation of the UFTA has been found to satisfy this requirement. *See Flagstar Bank, FSB v. Sellers*, 12th Dist. Butler No. CA2009-11-287, 2010-Ohio-3951, ¶ 23 (affirming judgment to pierce the corporate veil of an LLC where a

debtor systematically disposed of its assets to himself or to another LLC he owned, to the detriment of a creditor).

{¶ 56} As Plaintiffs point out, the trial court concluded that 369 made fraudulent transfers with respect to the 2015 transfers to NW and Olympia, and held Whichard liable. *See* Doc. #90 at p. 9.[8] Therefore, for purposes of the second *Belvedere* prong, there was substantial probative evidence that Whichard was guilty of exercising control over 369 to commit an unlawful act. Moreover, "[m]ultiple transactions designed to perpetuate a fraud can be considered a single transaction." *Premier Therapy, LLC*, 2016-Ohio-7934, 75 N.E.3d 692, at ¶ 119. " 'Thus an allegedly fraudulent conveyance must be evaluated in context; where a transfer is only a step in a general plan, the plan must be viewed as a whole with all its composite implications.' " *Id.*, quoting *Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir.1993). The other transactions involving 369 reveal such a course of conduct.

{¶ 57} R.C. 1336.04, which is part of the UFTA, provides that:

(A) A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor, whether the claim of the creditor arose before, or within a reasonable time not to exceed four years after, the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation in either of the following ways:

(1) With actual intent to hinder, delay, or defraud any creditor of the debtor;

---

[8] Both parties state that the trial court's finding on NW and Olympia should have been made under R.C. 1336.04 rather than R.C. 1336.05(A). We will address this issue later, when considering the other assignments of error.

(2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and if either of the following applies:

(a) The debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction;

(b) The debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.[9]

{¶ 58} Notably, "direct proof of fraud is seldom possible to obtain." *K–Swiss, Inc. v. Cowens Sports Center, Inc.*, 2d Dist. Greene No. 95-CA-48, 1995 WL 655945, *9 (Nov. 8, 1995). "Due to the difficulty in finding direct proof of fraud, courts of this state began long ago to look to inferences from the circumstances surrounding the transaction and the relationship of the parties involved." *Stein v. Brown*, 18 Ohio St.3d 305, 308-309, 480 N.E.2d 1121 (1985). In an action to set aside a fraudulent conveyance, the complainant has to affirmatively satisfy the burden of proof. *Id.* at 308. Nonetheless, "if the party alleging fraud demonstrates 'a sufficient number of badges, the burden of proof then shifts to defendant to prove that the transfer was not fraudulent.' " *Individual Business Servs. v. Carmack*, 2d Dist. Montgomery No. 25286, 2013-Ohio-4819, ¶ 27, quoting *Baker & Sons Equip. Co. v. GSO Equip. Leasing, Inc.*, 87 Ohio App.3d 644, 650, 622 N.E.2d 1113 (10th Dist.1993).

{¶ 59} R.C. 1336.04(B) provides an non-exclusive list of 11 factors that courts may

---

[9] R.C. 1336.04 was amended, effective March 27, 2013, but none of the changes are pertinent here. *See* Sub. H.B. 479, 2012 Ohio Laws File 201.

consider in deciding the issue of actual intent under R.C.1336.04(A)(1). These include "(1) Whether the transfer or obligation was to an insider; (2) Whether the debtor retained possession or control of the property transferred after the transfer; (3) Whether the transfer or obligation was disclosed or concealed; (4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit; (5) Whether the transfer was of substantially all of the assets of the debtor; (6) Whether the debtor absconded; (7) Whether the debtor removed or concealed assets; (8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred; (9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred; (10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred; (11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor."

{¶ 60} These eleven factors are called "badges of fraud." *Carmack* at ¶ 26. " 'Badges of fraud' are circumstances so frequently attending fraudulent transfers that the inference of fraud arises from them." *Cardiovascular & Thoracic Surgery of Canton, Inc. v. DiMazzio*, 37 Ohio App.3d 162, 166, 524 N.E.2d 915 (5th Dist.1987). Plaintiffs do not need to show evidence of all the badges of fraud to meet R.C. 1336.04(A)'s intent requirement. *Carmack* at ¶ 26, citing *Gevedon v. Ivey*, 172 Ohio App.3d 567, 2007-Ohio-2970, 876 N.E.2d 604, ¶ 76 (2d Dist.). " 'While the existence of one or more badges does not constitute fraud per se, * * * a complaining party is not required to demonstrate the presence of all badges of fraud; as few as three badges have been held to constitute clear and convincing evidence of actual fraudulent intent.' " *Id.*, quoting *Blood v.*

*Nofzinger*, 162 Ohio App.3d 545, 2005-Ohio-3859, 834 N.E.2d 358, ¶ 49 (6th Dist.).

{¶ 61} Here, there were multiple transactions which indicated that from the beginning, when 369's sole asset was sold to Eufala in December 2008, 369 intended to hinder collection of the debt. The evidence cannot be viewed in isolation, and there was "evidence of substantive probative value that favors" the position that 369 disposed of assets in an attempt to evade responsibility for the debt incurred to Plaintiffs. *Premier Therapy, LLC*, 2016-Ohio-7934, 75 N.E.3d 692, at ¶ 62.

{¶ 62} According to Whichard's affidavit, when 369 contracted with Plaintiffs in September 2009, the balance in 369's checking account was less than $20,000. Doc. #63, Whichard Affidavit at ¶ 3. Despite this fact, 369 contracted for services from Plaintiffs in an amount that 369 did not have funds to pay, and, in fact, did not pay. After Plaintiffs placed mechanics liens on the property, 369 immediately sold the property to Eufala. Whichard clearly knew of Plaintiffs' liens, which exceeded $36,715.53 at the time, as she signed the settlement statement. *See* Doc. #63, Defendant's Ex. B (settlement statement for 369 West First Street property).

{¶ 63} In her deposition, Whichard claimed that she gave the deed to 369 to Eufala in lieu of foreclosure. Whichard Deposition at pp. 54 and 56. Subsequently, in her affidavit, Whichard stated that in December 2008, 369 fell behind in payments on its promissory note/mortgage for the property and that the lender, Eufala, sued 369. Whichard further said that she was "forced" to sell the building to Eufala in exchange for Eufala forgiving a portion owed on the mortgage, which was greater than $300,000. Whichard Affidavit at ¶ 8. No documentation was provided to support these assertions, other than a general warranty deed from 369 and Northwest to Eufala, filed on January

7, 2009, and a settlement statement. *See* Doc. #63, Exs. A-4 and B.

**{¶ 64}** Neither document mentions a deed in lieu of foreclosure or any existing encumbrance of Eufala or anyone else who was paid off as a result of the sale. *Compare Panagouleas Interiors, Inc. v. Silent Partner Group, Inc.*, 2d Dist. Montgomery No. 18864, 2002 WL 441409, *3 (March 22, 2002) (warranty deed to be recorded stated that "this is a deed given in lieu of foreclosure by the grantor, in the original principal amount of $577,500, dated September 23, 1998, and recorded in the Montgomery County Clerk's office on 9/24/98 in Liber 8–5060 of Mortgage at Page E03").[10] There is also no record of any prior lawsuit or foreclosure action by Eufala against either Whichard or 369 in Montgomery County, Ohio. If these documents existed, they would have supported Whichard's account. The lack of any documentation is troubling and casts doubt on Whichard's credibility.

**{¶ 65}** According to the settlement statement, Eufala purchased the 369 building for $300,000 and received a general warranty deed. Again, while certain amounts were required to be withheld for payment of liens, that did not occur, and there was no evidence of an attempt to settle other than an offer made in 2013 – five years later – during subsequent litigation to collect the debt. Moreover, there was no evidence of what happened to the $300,000 that 369 received from the sale.

**{¶ 66}** As we mentioned, many of the payments reflected in 369's ledger were suspicious or questionable. However, the specific transfers at issue in the case before

---

[10] Filing the deed in lieu of foreclosure was held invalid in *Panagouleas* because it was signed as security for the original loan transaction and because no new consideration was given before it was filed and the mortgagor was deprived of his right of equity of redemption. *Panagouleas*, 2d Dist. Montgomery No. 18864, 2002 WL 441409, at *9-12. That is not the situation here.

us were: (1) Whichard's $100,000 "member draw" on January 22, 2013; (2) the $123,690 payment to Ashton on January 23, 2013; (3) the $8,000 payment to NW on November 5, 2015; and (4) the $6,000 transfer to Olympia on November 25, 2015. As we mentioned, the trial court found two of these conveyances to be fraudulent.

{¶ 67} All these transfers were to insiders – Whichard and her LLCs. R.C. 1336.04(B)(1). Whichard retained possession and control of the property transferred, either individually or as the sole member of her LLCs. R.C. 1336.04(B)(2). None of the transfers were disclosed. Plaintiffs did not learn of any transfers until after this lawsuit was filed. R.C. 1336.04(B)(3). Before any of the transfers were made, judgment had been obtained against 369. R.C. 1336.04(B)(4). Ultimately, as a result of these transfers ($237,000) and other questionable transfers, substantially all of 369's assets were depleted. R.C. 1336.04(B)(5). 369 and Whichard concealed assets through a complicated set of LLCs and exchanges between those entities. R.C. 1336.04(B)(7). As indicated in our discussion of the alter ego prong, there is no evidence that 369 received consideration equivalent to the value of any assets transferred. R.C. 1336.04(B)(8).

{¶ 68} On May 13, 2013, Whichard signed a mortgage obligating 369 to pay for loans up to $700,000 if she or her LLC, OKO, defaulted. At that time, 369 had a balance of only $88,219.36, and, therefore, may have been rendered insolvent as a result of the mortgage. Ex. A-5 at p. 5.[11] The amount of money reflected in the ledger thereafter

---

[11] Defendants did not present any evidence to indicate what the value of the Pearl Road property was at that time, nor did they present any evidence to indicate they were not then rendered insolvent by the $700,000 mortgage.

never approached $700,000. The highest level after May 13, 2013 was on August 9, 2013, when $107,401.25 was deposited for the sale of the Pearl Road property. *Id.* at p. 6. At that time, the balance was only $168,397.89. Shortly after that, Whichard took a member's draw of $100,000, leaving a balance at only $55,692.54.[12] *Id.* From that point forward, until August 24, 2016, when the account contained only $15.22, 369's assets were further depleted, again, with questionable payments, such as the $12,058.73 to Wake County Revenue on August 13, 2014, and the payments to NW and Olympia in November 2015. *Id.* at p. 7. R.C. 1336.04(B)(9).

{¶ 69} Given that nine badges of fraud existed, there was substantive probative evidence of an inference of fraud. The burden, therefore, shifted to Whichard to show that these transfers were not fraudulent. Whichard's sole offer of proof was her statement in her deposition that she was not aware of the amount of the "Dayton judgment." Whichard Deposition at p. 109. Of course, Whichard also said that perhaps she did know, but her memory was impaired due to her husband's death about a year prior to her deposition. *Id.* In light of the preceding discussions, here and with respect to alter ego, there are genuine issues of material fact, and substantive, probative evidence existed to satisfy the second prong of the *Belvedere* test. *Dombroski*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, at ¶ 29.

C. Resulting Injury or Loss

{¶ 70} The final prong of the *Belvedere* test requires that "injury or unjust loss

---

[12] We are aware of the possibility that 369's mortgage may have been satisfied by the Pearl Road property sale. However, as noted, Defendants presented absolutely no evidence on this point.

resulted to the plaintiff from such control and wrong." *Belvedere*, 67 Ohio St.3d at 289, 617 N.E.2d 1075. There is no question that Plaintiffs have sustained injury and loss due to Whichard's wrongs as the sole member of 369. Since 2008, Plaintiffs have attempted to collect a simple debt. The precise amount of the judgment, with interest since 2008 and attorney fees, is currently unknown; Plaintiffs claimed in the trial court that the judgment was over $200,000, while the trial court estimated $110,500. Doc. #90 at pp. 2-3. We noted in 2016 that 369 had engaged in "obfuscation, denial, delay and distraction that turned this rather simple collection case into a six year ordeal." *Weaner*, 2d Dist. Montgomery No. 26792, 2016-Ohio-8077, ¶ 34. Yet, nearly eleven years after the work was done, the case is on the third appeal.

{¶ 71} In view of the preceding discussion, we agree that the trial court erred in granting summary judgment against Plaintiffs on the issue of piercing the corporate veil. Consequently, Plaintiff's First Assignment of Error is sustained.


### III. Fraudulent Transfer

{¶ 72} Plaintiffs' Second Assignment of Error states that:

The Trial Court Erred in Failing to Find All Four Transfers Fraudulent

Under R.C. 1336.04(A).

{¶ 73} Under this assignment of error, Plaintiffs contend that the trial court erred in failing to find that the transfers to Whichard and Ashton in January 2013 were fraudulent transfers under R.C. 1336.04(A). Plaintiffs have said that they agree with Defendants that the trial court erroneously granted relief under R.C. 1336.05 with respect to the November 2015 transfers to NW and Olympia. According to Plaintiffs, the trial court

should properly have held all the transfers fraudulent under R.C. 1336.04(A).

{¶ 74} In responding to Plaintiffs' claims, Defendants first contend that Plaintiffs cannot assert a claim under R.C. 1336.04(A) because they did not raise in it their complaint. Instead, Plaintiffs raised a claim under R.C. 1336.05. Defendants concede that Plaintiffs did raise R.C. 1336.04(A) in their motion for summary judgment.

{¶ 75} Under notice pleading rules, "a plaintiff is not required to prove his or her case at the pleading stage." *York v. Ohio State Hwy. Patrol*, 60 Ohio St.3d 143, 144-45, 573 N.E.2d 1063 (1991). Instead, "the complaint need only put [a party] on notice of the nature of the claim against it." *Richards v. Rubicon Mill Condominium Assn.*, 100 Ohio App.3d 264, 269, 653 N.E.2d 751 (2d Dist.1995), citing Civ.R. 8(A) and (E), and *Salamon v. Taft Broadcasting Co.*, 16 Ohio App.3d 336, 338, 475 N.E.2d 1292 (1st Dist.1984).

{¶ 76} The first cause of action in the complaint is labeled "Violation of Ohio Uniform Fraudulent Transfer Act." Doc. #1, p.1 It is true that the complaint mentions R.C. 1336.05. However, the language in the first cause of action closely tracks the elements in R.C. 1336.04(A). *Compare* Doc. #1 at ¶ 35, 36, 38, and 40 with R.C. 1336.04(A)(1), (2), (2)(a), and (2)(b). Furthermore, "a basic tenet of Ohio jurisprudence [is] that cases should be decided on their merits." *Perotti v. Ferguson*, 7 Ohio St.3d 1, 3, 454 N.E.2d 951 (1983). Accordingly, Plaintiffs gave Defendants proper notice of the claim and did not improperly raise R.C. 1336.04(A) in their motion for summary judgment.

{¶ 77} As noted, both parties seemingly agree that the trial court should have based its decision on R.C. 1336.04(A) rather than R.C. 1336.05.[13] In its decision, the

---

[13] As will be evident later, we disagree, and find that judgment for Plaintiffs on the NW and Olympia transfers was proper under R.C. 1336.05(A). For this reason, we will confine our discussion to the January 2013 transfers.

trial court also analyzed the January 2013 transfers under R.C. 1336.04(A), and we will confine our discussion to that statute. *See* Doc. #90 at p. 7. The trial court found that Whichard had no intent to defraud because there was no evidence that she knew what 369 owed when the January 2013 transfers were made. *Id.* The court did not analyze the badges of fraud. As noted, direct intent is difficult to prove, and that is why courts discuss these badges. Where, as here, several badges of fraud appear, an inference of fraud arises. *Gevedon*, 172 Ohio App.3d 567, 2007-Ohio-2970, 876 N.E.2d 604, at ¶ 76. At that point, the burden of proof shifts and the defendant must prove the transfer was not fraudulent. *DiMazzio*, 37 Ohio App.3d at 165-166, 524 N.E.2d 915. As noted above, there are genuine issues of material fact on that point concerning the transfers that occurred in January 2013.

{¶ 78} While not critical to the issue of intent in January 2013, we note that, according to 369's general ledger, 369 had no money in its account as of August 24. 2016, and also did not own any other properties or have any source of income after August 2013. Nonetheless, after this action was filed in January 2017, 369 participated in the case for more than a year, until May 2018, when 369 filed for bankruptcy – almost two years after 369 knew it was insolvent, and shortly after the parties had filed cross-motions for summary judgment.[14]

{¶ 79} In view of the above discussion, as well as our discussion regarding piercing of the corporate veil, we find genuine issues of material fact with respect to whether the

---

[14] In reality, 369 was insolvent when Whichard signed the $700,000 mortgage in May 2013, and Whichard knew of that fact. This was five years before 369 filed for bankruptcy.

January 2013 transfers were made with actual intent to hinder, delay, or defraud Plaintiffs. At this point, we do not consider the November 2015 transfers, which the trial court set aside as fraudulent under R.C. 1336.05(A), as Plaintiffs did not raise error in connection with the trial court's findings in that regard.

{¶ 80} As a final matter, Defendants' contend that this action was barred by the statute of limitations because claims brought under R.C. 1336.04(A)(1) must be brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or reasonably could have been discovered by the claimant."   R.C. 1336.09(A).[15]   The transfers in question occurred on January 22, 2013; January 23, 2013; November 3, 2015; and November 24, 2015.   The complaint was filed on January 17, 2017, which was within the statutory period

{¶ 81} Accordingly, the Second Assignment of Error is sustained with respect to the summary judgment granted against Plaintiffs on the January 22, 2013 transfer of $100,000 to Whichard and the January 23, 2013 transfer of $123,690 to Ashton.

IV.   Effect of Bankruptcy Discharge of 369

{¶ 82} Defendants' First Cross-Assignment of Error states that:

The Trial Court Erred by Awarding Judgment for Plaintiffs for Fraudulent Conveyance After the Bankruptcy Court Discharged 369 LLC's Debts.

{¶ 83} Under this cross-assignment of error, Defendants contend that the trial court

---

[15]  The statute of limitations for claims brought under R.C. 1336.05(A) (which the trial court also used) is four years.   See R.C. 1336.05(A) and R.C. 1336.09(B).

should not have granted judgment under R.C. 1336.05 for the payments from 369's bank account in November 2015 to NW and Olympia. According to Defendants, the bankruptcy trustee is the only party who may prosecute fraudulent transfers because such actions are "core proceedings" in the bankruptcy court and the trustee is the real party in interest.

{¶ 84} " 'Core proceedings include, but are not limited to' 16 different types of matters" that are listed in 28 U.S.C. 157(b)(2). *Stern v. Marshall*, 564 U.S. 462, 474, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), quoting 28 U.S.C. 157(b)(2). One such item is "proceedings to determine, avoid, or recover fraudulent conveyances." 28 U.S.C. 157(b)(2)(H).

{¶ 85} In the trial court, Defendants did not raise this issue in response to Plaintiffs' summary judgment motion; they raised it in the context of asserting that the case should be stayed until 369's bankruptcy was resolved. 369 filed for bankruptcy on May 23, 2018, and Plaintiffs then voluntarily dismissed their claims against 369 on July 18, 2018. In early August 2018, Defendants moved for a stay in the common pleas court case due to the bankruptcy proceedings. In the stay motion, Defendants raised their theory that the issues should be settled in the bankruptcy court. Doc. #78, p. 2. After Plaintiffs responded, the trial court issued a decision in September 2018. *See* Doc. #82.

{¶ 86} While the trial court did not necessarily agree with Defendants' position that unusual circumstances existed warranting a stay of claims against non-debtors, the court decided that the bankruptcy court should decide this issue. *Id.* at p.3. The trial court, therefore, stayed the action.

{¶ 87} After being notified that the bankruptcy action involving 369 had been

terminated on November 11, 2018, the trial court reactivated the state action on April 3, 2019.   In its decision, the court commented on the positions of the parties and held that, since the bankruptcy court had entered a final judgment, the stay should be lifted.   *See* Doc. #89, p. 3.   According to the trial court, the Bankruptcy Trustee had reported that no property was received and that there were no assets to distribute.   *Id.* at pp. 1-2.   Shortly thereafter, the trial court issued its summary judgment decision.

{¶ 88} Defendants contend that the trial court erred in granting judgment to Plaintiffs because only a Chapter 7 bankruptcy trustee may prosecute a fraudulent action once a debtor files for bankruptcy.   However, that broad assertion is incorrect as applied to the circumstances of this case.

{¶ 89} "The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute.   Title 28 U.S.C. § 1334(b) provides that 'the district courts shall have original *but not exclusive* jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.' "   (Emphasis added.)   *Celotex Corp. v. Edwards*, 514 U.S. 300, 307, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995).

{¶ 90} 28 U.S.C. 1334(c)(1) further provides that:

Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

{¶ 91} Thus, even where a bankruptcy involves a "core proceeding," federal courts do not have exclusive jurisdiction and have permission to abstain under 28 U.S.C.

1334(c)(1). *In re Republic Reader's Serv., Inc.*, 81 B.R. 422, 427 (Bankr.S.D.Tex.1987) ("Given the narrow grant of exclusive jurisdiction, the broad powers of abstention left to the discretion of the district court, and the bar to enforcement of a judgment obtained in state court, abstention even over a core proceeding, such as one involving a claim formally asserted against the estate, is not only authorized, but often appropriate.")

{¶ 92} Federal courts also use a set of factors to decide if they should exercise their discretionary power of abstention. *E.g., McDaniel v. ABN Amro Mtge. Group*, 364 B.R. 644, 649-650 (S.D.Ohio 2007). "Permissive abstention from core proceedings under 28 U.S.C. § 1334(c)(1) is left to the bankruptcy court's discretion." *In re Petrie Retail, Inc.*, 304 F.3d 223, 232 (2d Cir.2002). Consequently, the bankruptcy court was not required to hear the state law claims against the non-debtors, and could have refrained from hearing them even if the case had been properly removed to the federal court.

{¶ 93} In support of their position, Defendants cite various cases, including *In re Manton*, 585 B.R. 630 (Bankr.N.D.Ga.2018). In *Manton*, a bank had received a deficiency judgment against a woman and her husband. The bank then filed a fraudulent conveyance action in state court against them, contending that they had fraudulently conveyed real property and land to partnerships they owned. The partnerships were also sued. *Id.* at 633-634. In July 2017, the state court entered a default judgment against the defendants and set a damages hearing for August 9, 2017. *Id.* at 634.

{¶ 94} Before the default judgment was entered, the debtor (the woman) filed for Chapter 7 relief. She was discharged on July 19, 2017, and on August 3, 2017, filed a notice of removal to the bankruptcy court. *Id.* After that, the bankruptcy trustee filed a

motion to intervene, and the plaintiffs in the state court action filed a motion asking that the case be remanded to state court. *Id.* In the context of deciding if the bankruptcy trustee could intervene, the court commented (as Defendants note) that "[o]nly the chapter 7 trustee may prosecute a fraudulent transfer action once a debtor files for bankruptcy." *Id.* at 635. The court, therefore, allowed the trustee to intervene.

**{¶ 95}** At that point, the court considered the debtor's motion to substitute the trustee as the real party in interest. The court then said:

> As the case law cited above supports, [11 U.S.C.] §§ 544 and 548 provide exclusive standing to a trustee to prosecute a fraudulent conveyance action unless the trustee has abandoned that claim or the automatic stay has been lifted. * * * Neither has occurred in this case.

*Id.* at 636. As a result, the court granted the debtor's motion to substitute the trustee as the real party in interest. *Id.*

**{¶ 96}** As noted, 369 filed for bankruptcy on May 23, 2018. 369 remained part of the state court action until July 18, 2018, when Plaintiffs dismissed 369 without prejudice. Unlike the debtor in *Manton*, 369 did not file a notice of removal to federal court when it had the chance to do so. If 369 wanted the merits of the state action to be determined by the bankruptcy court, it could have filed a notice of removal.

**{¶ 97}** Furthermore, "[p]roperty of the estate in a chapter 7 case remains property of the estate and protected by the automatic stay until either the property is distributed, abandoned, or the case is closed." *Manton* at 639, citing *Superior Bank v. Hilsman* (*In re Hilsman*), 351 B.R. 209, 213 (Bankr.N.D.Ala. 2006). According to the documents filed in the trial court, 369's bankruptcy trustee filed a report on August 16, 2018, stating that

369's estate had been fully administered. The trustee also asked to be discharged from any further duties. Doc. #81, Bankruptcy Petition Docket, p. 2. Subsequently, on November 9, 2018, the bankruptcy court discharged the trustee and closed the case. *Id.* at p. 3. At that time, the bankruptcy case was closed, and the property in question no longer belonged to the estate.

{¶ 98} After hearing from the parties, the trial court correctly stayed the state court action during the bankruptcy proceeding. *See* Doc. #82, Decision and Entry Regarding Automatic Stay from Bankruptcy Filing of 369 West First LLC. After the bankruptcy case was closed, the trial court then correctly reactivated the case on March 19, 2019. Doc. #89, Decision and Entry Reactivating Action and Lifting Stay of Proceedings.

{¶ 99} Defendants also complain that Plaintiffs failed to remove the state action to federal court. However, Plaintiffs were not required to file a notice of removal. 28 U.S.C. 1452(a) (pertaining to removal in bankruptcy cases) provides that "[a] party *may* remove any claim or cause of action in a civil proceeding * * *." (Emphasis added.) "In ordinary usage, the word 'may' usually implies permissive or discretionary conduct, not that which is mandatory." *Gingras v. Gen. Elec. Co.*, 476 F.Supp. 644, 646 (E.D.Pa.1979). *See also State ex rel. City of Niles v. Bernard*, 53 Ohio St.2d 31, 34, 372 N.E.2d 339 (1978) ("statutory usage of the term 'may' is generally construed to render optional, permissive, or discretionary the provision in which it is embodied * * * ").

{¶ 100} Furthermore, once a case has been removed, the bankruptcy court has the ability to remand the case back to state court on "any equitable ground." 28 U.S.C. 1452(b). Equitable remand "is generally appropriate where grounds for discretionary abstention exist. In deciding the appropriateness to remand a proceeding, some courts

have used a seven part test which addresses similar considerations to the considerations involved in a decision to exercise discretionary abstention * * *." *In re Underwood*, 299 B.R. 471, 478 (Bankr.S.D.Ohio 2003).

{¶ 101} Finally, Defendants argue that the trial court should not have awarded judgment for Plaintiffs because the bankruptcy court discharged 369's debts. This is incorrect. 11 U.S.C. 524(e) provides (with an exception not relevant here) that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." Both state and federal courts have held that this includes entities sued on fraudulent conveyances from the debtor. In addition, a bankruptcy discharge only relieves the debtor of its own personal obligations and does not relieve others of liability on the debt. *See Kathy B. Ents., Inc. v. United States*, 779 F.2d 1413, 1415 (9th Cir.1986); *Power Equities, Inc. v. Atlas Telecom Servs.-USA, Inc.*, N.D. Tex. No. 3:06-CV-1892-G, 2007 WL 43843, *3 (Jan. 5, 2007); *Klingman v. Levinson*, 158 B.R. 109, 113 (N.D.Ill.1993); *In re Euro-Am. Lodging Corp.*, S.D. N.Y. 12 Civ. 4996 (AJN), 2013 WL 12085090, *2 (Mar. 25, 2013); *Dwyer v. Meramec Venture Assoc., L.L.C.*, 75 S.W.3d 291, 294 (Mo.App.2002); *J.P. Castagna, Inc. v. Castagna*, Conn. Super. No. CV 92 0523960, 1995 WL 225473, *3 (Apr. 7, 1995).

{¶ 102} The point here is that even if the fraudulent conveyance were a core proceeding that the trustee was entitled to prosecute, he chose not to do so, and did not initiate adversary proceedings against any party. Instead, the trustee asked to be discharged from further duties and the case was closed. At that time, the transferred property ceased to be the property of the estate, and the trial court could proceed to decide the action.

{¶ 103} Accordingly, the First Cross-Assignment of Error is without overruled.

## V.   Summary Judgment on November 2015 Transfers

{¶ 104} Defendants' Second Cross-Assignment of Error states that:

The Trial Court Erred in Awarding Summary Judgment for Plaintiffs/Appellants in the Absence of Evidence of the Transfers or Proof Under ORC § 1336.05(A) or (B).

{¶ 105} Under this cross-assignment of error, Defendants contend that Plaintiffs failed to provide the trial court with sufficient evidence to justify summary judgment against NW and Olympia.   According to Defendants, there was no evidence that Olympia and NW failed to provide value for the transfers in November 2005.   The trial court found the transfers to Olympia and NW fraudulent under R.C. 1336.05(A) because there was no evidence of reasonable equivalent value and 369 was insolvent at the time of the transfers.   Doc. #90 at p. 9.

{¶ 106} R.C. 1336.05(A) provides that:

A transfer made or an obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

{¶ 107} Under R.C. 1336.05(A), intent is not required; instead, constructive fraud is imputed if the statutory elements are met.   *Premier Therapy, LLC,* 2016-Ohio-7934,

75 N.E.3d 692, at ¶ 111; *Harrison v. Creviston*, 168 Ohio App.3d 349, 2006-Ohio-3964, 860 N.E.2d 113, ¶ 38 (8th Dist.); *Comer v. Calim*, 128 Ohio App.3d 599, 606, 716 N.E.2d 245 (1st Dist.1998) (discussing R.C. 1336.05(B), which contains similar wording). *See also Hanes v. Giambrone*, 14 Ohio App.3d 400, 406, 471 N.E.2d 801 (2d Dist.1984) ("[c]onstructive fraud may arise from the circumstances of the transaction or the relationship of the parties, without the existence of fraudulent intent affecting the conscience.")

{¶ 108} On appeal, Plaintiffs state that the trial court erred in making an award under R.C. 1336.05(A). They contend, instead, that the trial court should have relied on R.C. 1334.04(A), as argued in their brief. We disagree and find that R.C. 1336.05(A) properly applied.

{¶ 109} As noted, on July 8, 2015, a trial court ordered 369 to pay to Plaintiffs attorney fees of $60,143.25. Previously, on August 28, 2014, the court had also awarded Servpro $13,939, plus 1.5% monthly interest from October 21, 2008, and Possert $9,402.25, plus 1.5% monthly interest from November 7, 2008. Without even considering almost six years of interest, the debt in July 2015 was $83,484.50.

{¶ 110} We disagree that there was insufficient evidence to support summary judgment under R.C. 1336.05(A). As we mentioned, 369's ledger shows a $55,692.54 balance on August 28, 2013, and there is no evidence that 369 obtained any assets thereafter that would generate income. Whichard stated in her deposition that she did not know how 369 obtained $14,000 in November 2015 to make the payments to NW and Olympia. *See* Whichard Deposition, pp. 101-103. Yet, the payments occurred.

{¶ 111} Under R.C. 1336.02(A)(1), "[a] debtor is insolvent if the sum of the debts

of the debtor is greater than all of the assets of the debtor at a fair valuation." As of July 8, 2015, 369 was insolvent because it did not have adequate assets to pay the judgment then due.[16]

{¶ 112} Given Whichard's course of conduct, which included transferring money to and from various LLCs, it is possible that money was placed into 369 from other sources, including NW and Olympia. However, the ledger that Whichard submitted indicates otherwise.

{¶ 113} Whichard stated in her affidavit that an attached ledger showed all deposits and withdrawals for 369 between 2012 and 2016. Doc. #63, Whichard Affidavit at ¶ 14. However, after September 1, 2013, no more accounts receivable were listed, and there were no undeposited funds listed after August 14. 2013. Ex. A-5 attached to Whichard Affidavit, pp. 10-12. All that occurred was that Whichard continued to drain the account.

{¶ 114} After those dates, there were some other transactions. In November 2015, there were payments to NW and Ashton, respectively, of $8,000 and $6,000. *Id.* at p. 12. In April 2016, there was an "ATW" contribution by Ashton of $3,000 to pay bills. Property taxes were also paid in 2014 and 2015 on behalf of Beacon Plaza (listed under another LLC of Whichard, AT100 LLC). These amounts totaled $24,877.02. *Id.* at p. 16.[17] Payment of Whichard's automobile expenses also continued from August 20, 2013

---

[16] As we mentioned, 369 was insolvent in fact, in May 2013, when Whichard signed a mortgage obligating 369 to pay for loans up to $700,000 if she or her LLC, OKO, defaulted on the mortgage.

[17] The total payments for Beacon Plaza property taxes between February 6, 2013 and December 9, 2015, were $69,826.54.

through August 23, 2016.   *Id.* at pp. 16-17.

{¶ 115} These payments were financed by continuing to drain 369's bank account. Nonetheless, the ledger that Whichard submitted shows no deposits or payments to 369 by NW or Olympia prior to November 2015.   Thus, all the elements of R.C. 1335.05(A) had been met: (1) 369 was insolvent by July 2015 at the latest; (2) 369 transferred $14,000 to NW and Olympia in November 2015; (3) there is no evidence that 369 received a reasonably equivalent value for the transfers; and (4) the claim against 369 arose before November 2015.   Given these undisputed facts, the trial court did not err in granting summary judgment under R.C. 1336.05(A) with respect to the November 2015 transfers to NW and Olympia.   As a result, we need not consider R.C. 1336.04(A).

{¶ 116} Accordingly, Defendants' Second Assignment of Error is overruled.


VI.   Conclusion

{¶ 117} Plaintiffs' First and Second Assignments of Error having been sustained, and Defendants' First and Second Assignments of Error having been overruled, the judgment of the trial court is affirmed in part and reversed in part.   This matter will be remanded to the trial court for further proceedings.


. . . . . . . . . . . .


TUCKER, J., concurs.

HALL, J., concurs:

{¶ 118} I concur in my colleagues' legal analysis regarding the assignments of

error raised by the Plaintiffs. I write separately to address the Defendants' first cross-assignment of error, that the Plaintiffs' fraudulent conveyance claims were required to be pursued in 369's bankruptcy proceeding, to which Plaintiffs were parties.

**{¶ 119}** Defendants argue, and I agree, that the case of *Lincoln Elec. Co. v. Manahan*, N.D.Ohio No. 1:10 CV 00724, 2011 WL 3516201 (Aug. 11, 2011), interpreting federal and Ohio law, stands for the proposition that when bankruptcy is filed, a fraudulent conveyance claim, even against third parties, becomes property of the bankruptcy estate which can only be pursued (or perhaps assigned, distributed or abandoned) by the trustee:

> When a bankruptcy petition is filed, a bankruptcy estate is created. The estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). Courts broadly construe the phrase "all legal or equitable interests of the debtor in property" to include "rights of action," such as claims based on state or federal law. *See Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir.1988); *Am. Nat'l Bank of Austin v. MortgageAmerica Corp. (In re MortgageAmerica Corp.)*, 714 F.2d 1266, 1274 (5th Cir.1983).

> The bankruptcy trustee's role is to manage the estate and gather up all available property, including causes of action, for an eventual pro rata, monetary distribution among the debtor's creditors. In addition to representing the rights of the debtor, the trustee represents the interests of the debtor's creditors. Under the "strong-arm" provision of the bankruptcy code, the trustee may step into the shoes of a creditor for the purpose of

bringing a cause of action under a state fraudulent conveyance statute. *NLRB v. Martin Arsham Sewing Co.*, 873 F.2d 884, 887 (6th Cir.1989). "The trustee's single effort eliminates the many wasteful and competitive suits of individual creditors." *Koch [Refining] v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1342-43 (7th Cir.1987).

The trustee has the exclusive right to assert the claims belonging to the estate. *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Group Health Trust),* 25 F.3d 1281, 1284 (5th Cir.1994). However, the bankruptcy trustee has no standing to bring claims that are personal to an individual creditor, since these claims do not belong to the estate. *In re E.F. Hutton Southwest Properties II, Ltd.*, 103 B.R. 808, 812 (Bankr.N.D.Tex.1989). A personal claim is one in which the claimant has been harmed and "no other claimant or creditor has an interest in the cause." *Koch Refining*, 831 F.2d at 1348. To determine whether a cause of action belongs to the estate or an individual creditor, the court must "look to the injury for which relief is sought and consider whether it is peculiar and personal to the claimant or general and common to the corporation and creditors." *Id.* at 1349. "In the final analysis, whether a right of action exists in the trustee depends on whether the action vests in the trustee as an assignee for the benefit of creditors or, on the other hand, accrues to specific creditors. The latter is the case if the action is not in a fair sense an asset of the bankrupt which passes to the trustee." *Cissell v. American Home Assur. Co.*, 521 F.2d 790 (6th Cir.1975) (citing *In re Associated Oil*

*Co.*, 289 F. 693 (6th Cir.1923)).

*Manahan* at *4. Ordinarily then, applying this reasoning, the Plaintiffs should have raised these issues in the bankruptcy court.

{¶ 120} However, the reason for requiring voidable or fraudulent transfer claims to be raised in bankruptcy court is that those transfers, even if in the hands of a third party, are potential assets of the bankruptcy estate recoverable for distribution to all creditors, according to bankruptcy priorities, instead of assets to be cherry-picked by one enterprising creditor. But on this record, the notice of the bankruptcy court transmitted when the bankruptcy case was closed indicates that the *only* creditors of the estate were the Plaintiffs (William Weaner dba Servpro and Shooter Construction). Therefore, the Plaintiffs' voidable or fraudulent transfer claims were peculiar or personal to the Plaintiffs because they were the only other parties involved. Moreover, on this record it is apparent that the bankruptcy trustee did not pursue or recover distributable assets, and therefore the trustee did not recover the voidable or fraudulently transferred assets from the third-party defendants in this case. The third-party defendants therefore cannot claim prejudice by Plaintiffs' pursuit of the claims which the trustee apparently abandoned.

{¶ 121} Accordingly, I agree with the analysis regarding the Plaintiffs' assignments of error, and I also agree to overrule the Defendants' first cross-assignment of error and agree the matter should be remanded to the trial court for further proceedings.

Copies sent to:

Craig T. Matthews
T. Andrew Vollmar
Adam Armstrong
Hon. Richard Skelton