[Cite as *Momentum Freight Logistics Corp. v. Benie Logistics, Inc.*, 2025-Ohio-5738.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Momentum Freight Logistics Corp., | : | |
| Plaintiff-Appellee, | : | No. 24AP-263<br>(C.P.C. No. 21CV-5528) |
| v. | : | (REGULAR CALENDAR) |
| Benie Logistics Inc. et al., | : | |
| Defendants-Appellants. | : | |

D E C I S I O N

Rendered on December 23, 2025

**On brief:** *Critchfield, Critchfield & Johnston, Ltd., Samuel J. Webber*, and *Amanda E. Webber* for appellee. **Argued:** *Amanda E. Webber.*

**On brief:** *Choken Welling LLP*, and *David A. Welling* for appellants. **Argued:** *David A. Welling.*

APPEAL from the Franklin County Court of Common Pleas

MENTEL, J.

{¶ 1} Defendants-appellants, Benie Logistics, Inc. ("Benie"), Elizabeth Dawson, and Russell Dawson (collectively "appellants"), appeal from a judgment of the Franklin County Court of Common Pleas entered in favor of plaintiff-appellee, Momentum Freight Logistics Corporation ("Momentum"). For the reasons that follow, we affirm.

**I. Facts and Procedural History**

{¶ 2} On September 1, 2021, Momentum filed a complaint against Benie alleging claims for breach of contract, unjust enrichment, civil theft, and conversion. The events

giving rise to the complaint stemmed from Benie's agreement to purchase Momentum's FedEx trucking and delivery business located in Mansfield, Ohio.

{¶ 3}    Momentum and Benie entered into an Asset Purchase Agreement ("APA") on June 1, 2020, whereby Momentum agreed to sell its FedEx trucking and delivery business to Benie for $1.675 million.  Section 1.2 of the APA identified certain assets as "Excluded Assets" that Momentum would not convey to Benie in the sale.  (Compl. Ex. A, APA at § 1.2.)  Pertinent to the present appeal, the Excluded Assets included the following item:

> In the event that Buyer assumes Seller's Ohio Workers' Compensation policy, Policy Number: 1519862, Buyer agrees that the Workers' Compensation premium dividend reimbursement, for the Policy Period 07/01/2019 - 07/01/2020 and for the Policy Period 07/01/2020 - 07/01/2021, if any, prorated for the months Seller was in operation, shall be provided to seller in a timely fashion.

(Compl. Ex. A, APA at § 1.2.7.)

{¶ 4}    James Homer, the president of Momentum, and Elizabeth Dawson, the president of Benie, executed the APA on behalf of their respective companies.  The APA did not contain any personal guarantees.  Elizabeth and her husband, Russell Dawson, were the sole shareholders of Benie; Russell also served as Benie's secretary and treasurer.

{¶ 5}    Before the parties closed on the sale of the business, they agreed Benie would assume Momentum's Bureau of Workers' Compensation ("BWC") policy.  As such, in late July of 2020, the parties executed BWC form U-118 to effectuate the transfer of the policy. The form identified Momentum with BWC policy number 01519862 as the former employer, and Benie with BWC policy number 80079456 as the succeeding employer.  The BWC approved the transfer and Benie assumed BWC policy number 01519862. Momentum sold its business to Benie effective August 28, 2020.

{¶ 6}    On October 21, 2020, Mr. Homer sent Elizabeth an email stating the BWC had announced it was "issuing policy dividends (reimbursements) for the premiums paid for the 2019 policy year (July 1, 2019 – June 3[0], 2020)." (Trial Ex. D.)  Mr. Homer noted the BWC would mail the dividend check to Benie, and he asked Elizabeth to either "write [him] a check or send [him] a wire for the dividend amount." (Trial Ex. D.)  The BWC issued a policy holder dividend to Benie in the amount of $69,269 on October 22, 2020.

Mr. Homer sent Elizabeth another email on November 11, 2020, noting the BWC confirmed it mailed the dividend check to Benie on October 30, 2020.

{¶ 7} Elizabeth responded to Mr. Homer on November 13, 2020, stating that Benie "ha[d] not received anything yet." (Trial Ex. D.) Elizabeth believed the BWC would mail the check to her home address in Texas, but the BWC mailed the check to Benie's business address in Ohio and the check "was lost at the [FedEx] terminal." (Sept. 18, 2023 Tr. Vol. 1 at 90.) Mr. Homer contacted the BWC to inquire about the lost check. In response to Mr. Homer's inquiry, the BWC reversed and reissued the $69,269 dividend check to Benie in early December 2020. (Tr. Vol. 1 at 22; Trial Ex. I.)

{¶ 8} On December 7, 2020, the BWC mailed the $69,269 dividend check to Benie. The letter attached to the December 7, 2020 check simply stated if Benie had any question regarding the payment to contact the BWC. On December 10, 2020, the BWC sent Benie another dividend check in the amount of $257,999.32. The letter attached to the December 10, 2020 check stated the enclosed check was "part of [the BWC's] $5 billion dividend for Ohio's private and public employers covered by the state insurance fund. As Gov. DeWine said when he announced the dividend in October, '[t]his is about keeping businesses open and people employed.'" (Trial Ex. O.) The letter informed the employer the check was "[theirs] to spend as [they] wish," although the BWC encouraged employers to "invest in the health and safety of your most important asset – your people." (Trial Ex. O.)

{¶ 9} The BWC also issued Frequently Asked Questions for Employers ("FAQs") with both checks. The FAQs indicated the $69,269 check "[w]as 100% of billed premium for eligible employers for the policy period of July 1, 2019, through June 30, 2020" (i.e., the "2019 policy period"), and that the $257,999.32 check "[w]as 372% of billed premium for eligible employers for the [2019] policy period." (Trial Ex. E; Trial Ex. G.) To receive either check, an employer had to satisfy the following criteria: (1) be a State Insurance Fund employer, (2) have reported payroll greater than zero for the 2019 policy period, (3) have been billed premium for the 2019 policy period, (4) have completed their payroll true-up for the 2019 policy period, and (5) be in "active, reinstated, combined, cancelled – business sold, or debtor-in-possession status or, in a lapsed status with a lapse date of Jan. 1, 2020 or later as of Oct. 2, 2020." (Trial Ex. E; Trial Ex. G.) For an employer who assumed

another employer's BWC policy, the FAQs stated the BWC would "determine eligibility based on the status of the predecessor policy. If the predecessor policy would have been eligible for the dividend, the successor [would] receive the applicable dividend." (Trial Ex. E.)

{¶ 10} Momentum satisfied the criteria necessary to receive both the $69,269.00 and $257,999.32 dividend checks from the BWC. (Tr. Vol. 1 at 16, 26, 28; Trial Ex. II; Trial Ex. LL.) Although Benie did not satisfy the eligibility criteria for either check, because Benie acquired Momentum's BWC policy and Momentum was eligible to receive the checks, Benie was entitled to receive the checks from the BWC.

{¶ 11} On December 12, 2020, Mr. Homer sent Elizabeth an email asking whether she had "received the two Worker[s'] Compensation policy dividend checks owed to Momentum Freight" pursuant to "paragraph 1.2.7" of the APA. (Trial Ex. D.) Elizabeth responded on December 13, 2020, stating the Dawsons had "not been back to Texas to confirm that [the checks were] received. We will let you know after we return." (Trial Ex. D.) On December 29, 2020, Mr. Homer sent Elizabeth another email regarding the "BWC policy dividend checks," noting the parties needed "resolution on this very shortly." (Trial Ex. D.) Momentum's attorney sent Benie a letter demanding payment of the $69,269 and $257,999.32 BWC dividend checks on January 12, 2021.

{¶ 12} On January 27, 2021, appellants' counsel sent a letter responding to Momentum's demand letter. Appellants' counsel alleged Momentum "fraudulently induced [Benie] into entering into the APA" and that Momentum had "breached material terms of the APA." (Trial Ex. M.) Appellants' counsel acknowledged that, if the APA was a "valid and enforceable agreement," Benie's obligation under the APA was "to provide, in a timely fashion, to Momentum Freight any premium dividends it should receive" for the applicable policy periods. (Trial Ex. M.) Appellants informed Momentum the BWC "checks ha[d] been deposited into a separate interest-bearing account" to "ensure Benie Logistics complie[d] with the terms of the APA" while they investigated the matter. (Trial Ex. M.) The Dawsons deposited both the $69,269 and $257,999.32 checks from the BWC into Benie's business savings account at Chase Bank on January 25, 2021. (Trial Ex. FF.)

{¶ 13} On October 5, 2021, the Dawsons transferred the total amount of the two BWC dividend checks from Benie's business savings account to their joint personal savings

account. The following day, the Dawsons transferred the BWC funds from their joint personal savings account to their joint personal checking account, and then to Russell's separate personal checking account. Russell used the funds from the BWC dividend checks to "pay [himself] back" for "bills [he] paid for [Benie's] benefit." (Sept 19, 2023 Tr. Vol. 2 at 218, 226.) By the end of November 2021, Benie was no longer in business.

{¶ 14} Momentum filed an amended complaint on April 11, 2022. Momentum's amended complaint added Elizabeth and Russell as defendants, and added claims for piercing the corporate veil, fraudulent inducement, fraudulent transfer, and civil conspiracy.

{¶ 15} On April 24, 2023, Elizabeth and Russell filed a motion for summary judgment. The Dawsons noted they were not parties to the APA and therefore claimed they were not liable for Benie's "corporate contractual obligation" to pay Momentum "the dividend portion of the BWC money." (Mot. for Summ. Jgmt. at 3.) The Dawsons also claimed the economic loss rule barred Momentum's tort claims against them. Momentum filed a response to the Dawsons' motion for summary judgment on May 22, 2023.

{¶ 16} On June 13, 2023, the trial court denied the Dawsons' motion for summary judgment. The court found genuine issues of material fact regarding whether the Dawsons could be held personally liable for Benie's breach of the APA. The court further found the economic loss rule did not bar Momentum's tort claims because the tort claims alleged "a breach of duty separate from that set forth in the APA." (June 13, 2023 Decision & Entry at 10.)

{¶ 17} The matter came before the court for a bench trial on September 18 and 19, 2023. Mr. Homer, Elizabeth, and Russell were the sole witnesses to testify at the trial. Elizabeth explained that, based on the word "reimbursement" in section 1.2.7 of the APA, the Dawsons believed section 1.2.7 meant "[t]hat which Momentum paid into BWC" as premiums "would be reimbursed" to Momentum. (Tr. Vol. 1 at 75, 95-96.) As such, the Dawsons agreed the APA required Benie to provide the $69,269 BWC check amount to Momentum, because Momentum paid $69,269 in premiums to the BWC during the 2019 policy period. However, the Dawsons claimed Benie did not owe Momentum the $257,999.32 BWC check amount. Mr. Homer affirmed the appellants never provided him with either the $69,269 or the $257,999.32 BWC check amounts.

{¶ 18} On March 19, 2024, the trial court issued a decision and entry resolving the case. The court determined that section 1.2.7 of the APA required Benie to "timely forward both the $69,269.00 and $257,999.32 payments from the [BWC] to [Momentum] because those payments were 2019 policy premium dividends for policy no. 1519862." (Mar. 19, 2024 Decision & Entry at ¶ 49.) The court noted Benie never provided either check amount to Momentum, and that in October of 2020 the Dawsons transferred the total amount of the two BWC dividend checks "to an account owned by Russell Dawson where those funds were extinguished." (Mar. 19, 2024 Decision & Entry at ¶ 66.) As such, the court found Benie breached the APA by not providing the BWC dividend checks to Momentum in a timely fashion. The court also found the evidence demonstrated Momentum could pierce the corporate veil of Benie and hold the Dawsons personally liable for the breach of contract damages. The court found appellants committed civil theft with respect to the $69,269 BWC check, but that appellants did not commit civil theft with respect to the $257,999.32 BWC check. The court awarded Momentum treble damages for the theft of the $69,269. The court determined appellants committed conversion, but noted Momentum pled conversion as an alternative to civil theft. The court also determined appellants committed fraudulent transfer and civil conspiracy, but found the damages for both claims were the same as the damages resulting from the breach of contract. The court dismissed Momentum's claims for unjust enrichment and fraudulent inducement. As such, the court entered judgment against Benie, Elizabeth, and Russell, jointly and severally, in the amount of $257,999.32 plus $69,269 trebled to $207,807, for a total judgment of $465,806.32, plus interest at the statutory rate.

## II. Assignments of Error

{¶ 19} Appellants appeal, assigning the following errors for our review:

> ASSIGNMENT OF ERROR NO. 1
> The Trial Court erred as a matter of law in defining "[Bureau of] Workers' Compensation premium dividend reimbursement" as used in the contract between the parties. The definition should not encompass COVID-Pandemic-related stimulus money that the BWC issued during COVID.
>
> ASSIGNMENT OF ERROR NO. 2
> The Trial Court erred in deciding a mixed matter of law and fact in finding a fraudulent transfer of $327,268.32 where the

Appellees had no right, title, or interest in part of the money that was transferred.

ASSIGNMENTS OF ERROR NO. 3
The Trial Court erred in deciding a mixed question of law and fact in finding that Appellees can pierce the corporate veil of Benie Logistics, Inc.

ASSIGNMENT OF ERROR NO. 4
The Trial Court erred in deciding a mixed question of law and fact in finding that Appellants engaged in civil theft by withholding the first dividend payment of $69,269, and awarding damages of three times the same totaling $207,807.

ASSIGNMENT OF ERROR NO. 5
The Trial Court erred in deciding a mixed question of law and fact in finding that Appellants engaged in a civil conspiracy to deprive Appellees of $327,268.32.

## III. First Assignment of Error—Breach of Contract

{¶ 20} In their first assignment of error, appellants contend the trial court erred by interpreting the phrase "Workers' Compensation premium dividend reimbursement" in section 1.2.7 of the APA to include COVID-related stimulus money. As such, appellants claim the trial court erred by finding Benie breached the APA with respect to the $257,999.32 BWC check.

{¶ 21} To demonstrate a claim for breach of contract, a plaintiff must establish: "(1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 2018-Ohio-2602, ¶ 28 (10th Dist.), citing *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, ¶ 41. The construction of a written contract is a question of law. *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St.2d 241 (1978), paragraph one of the syllabus; *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 2007-Ohio-5026, ¶ 38. "[A] de novo standard of review applies to matters of law, including the interpretation and construction of written contracts." *Gatling Ohio, LLC v. Allegheny Energy Supply Co., LLC*, 2018-Ohio-3636, ¶ 12 (10th Dist.), citing *Long Beach Assn. v. Jones*, 82 Ohio St.3d 574 (1998). "Under the de novo standard, the court of appeals gives no deference to a trial court's interpretation of legal issues." *Id.*

{¶ 22} When construing the terms of a written contract, a court's principal objective is to determine the intent of the parties. *Jezerinac v. Dioun*, 2020-Ohio-587, ¶ 33 (10th Dist.), citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Companies.*, 86 Ohio St.3d 270, 273 (1999). The parties' intent "is presumed to reside in the language they chose to employ in the agreement." *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 132 (1987). " 'When parties to a contract dispute the meaning of the contract language, courts must first look to the four corners of the document to determine whether or not an ambiguity exists.' " *Min You v. Northeast Ohio Med. Univ.*, 2020-Ohio-4661, ¶ 15 (10th Dist.), quoting *Drs. Kristal & Forche, D.D.S., Inc. v. Erkis*, 2009-Ohio-5671, ¶ 21 (10th Dist.). "Where the terms of the contract are clear and unambiguous, a court should not look beyond the plain language of the instrument to determine the rights and obligations of the parties." *Guaranteed Constr. Servs. v. Grand Communities, Ltd.*, 2017-Ohio-9288, ¶ 23 (10th Dist.), citing *Drs. Kristal & Forche, D.D.S., Inc.* at ¶ 21.

{¶ 23} "Common words in a contract are given their plain and ordinary meaning, unless another meaning is clearly evident from the face or overall content of the contract, or unless the result is manifestly absurd." *Hope Academy Broadway Campus v. White Hat Mgt., L.L.C.*, 2015-Ohio-3716, ¶ 36, citing *Alexander*. The court must read words and phrases in context and apply the rules of grammar and common usage. *Buffalo Wings & Rings, LLC v. M3 Restaurant Group, LLC*, 2015-Ohio-3843, ¶ 18 (10th Dist.), citing *Keller v. Foster Wheel Energy Corp.*, 2005-Ohio-4821 (10th Dist.). It is the duty of a court to give effect to the words used in a contract, not to delete words used or to insert words not used. *Cleveland Elec. Illuminating Co. v. Cleveland*, 37 Ohio St.3d 50 (1988), paragraph three of the syllabus; *Eckel v Bowling Green State Univ.*, 2012-Ohio-3164, ¶ 23 (10th Dist.).

{¶ 24} Contract terms are ambiguous if the meaning of the terms cannot be discerned from reading the entire contract, or if the terms are reasonably susceptible to more than one interpretation. *Moody v. Ohio Rehab. Servs. Comm.*, 2002-Ohio-6965, ¶ 7 (10th Dist.), citing *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 55 (2d Dist. 1998). While the issue of whether a contract is ambiguous is a question of law, the meaning of words or phrases in an ambiguous contract is a question of fact. *Atelier Dist. v. Parking Co. of Am., Inc.*, 2007-Ohio-7138, ¶ 17 (10th Dist.), citing *Ohio Historical Soc. v. Gen. Maintenance & Eng. Co.*, 65 Ohio App.3d 139, 146 (10th Dist. 1989).

Where the language of a contract is ambiguous, a court may consider extrinsic evidence to ascertain the parties' intent. *Westfield Ins. Co. v. Galatis*, 2003-Ohio-5849, ¶ 12, citing *Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635 (1992). *See also Albert v. Shiells*, 2002-Ohio-7021, ¶ 20 (10th Dist.) (stating that "where the meaning of a contract is ambiguous, the ambiguity should be construed against the drafting party").

{¶ 25} As noted, section 1.2.7 of the APA identified "the Workers' Compensation premium dividend reimbursement, for the [2019] Policy Period" as an Excluded Asset. (Compl. Ex. A, APA § 1.2.7.) Although the APA stated the amount would be "prorated for the months [Momentum] was in operation," Momentum was in operation during the entire span of the 2019 policy period. As such, the APA obligated Benie to provide the total amount of the BWC premium dividend reimbursement for the 2019 policy period to Momentum "in a timely fashion." (Compl. Ex. A, APA § 1.2.7.)

{¶ 26} The trial court concluded appellants' construction of section 1.2.7 did "not comport with the plain language of what section 1.2.7 of the Agreement provides." (Mar. 19, 2024 Decision & Entry at ¶ 93.) The court noted interpreting the word "reimbursement" as "limiting the amount of the payments . . . to the actual amount of premiums [Momentum] paid for the 2019 policy period would ignore the use of the word 'dividends' in section 1.2.7, which indicate[d] something more than what was paid as premiums." (Mar. 19, 2024 Decision & Entry at ¶ 93.) The court found that both the $69,269.00 and $257,999.32 checks from the BWC "were policy premium dividends for the 2019 policy period as defined in the Agreement." (Mar. 19, 2024 Decision & Entry at ¶ 98.)

{¶ 27} At trial, Elizabeth affirmed the "$69,269 should have been paid to Momentum Freight according to section 1.2.7 of the [APA]," and that Benie never paid the $69,269 to Momentum.[1] (Tr. Vol. 1 at 96 [1286].) Appellants do not challenge the trial court's conclusion that Benie breached the APA by failing to provide the $69,269.00 BWC check to Momentum.

{¶ 28} Rather, appellants challenge the trial court's conclusion that Benie breached the APA by failing to provide the $257,999.32 BWC check to Momentum. Appellants

---

[1] Elizabeth stated Benie did not provide the $69,269 BWC payment to Momentum because Momentum claimed Benie owed it "more than $400,000" and Momentum would not agree to sign a "release" and "settle for just $69,000." (Tr. Vol. 1 at 97.) However, Momentum's refusal to release Benie from liability for additional amounts Momentum claimed due under the APA did not relieve Benie of its contractual obligation to provide Momentum with the $69,269 payment from the BWC.

contend that, while the parties "anticipated at the time of entering the APA that the BWC may issue a premium dividend reimbursement to repay premiums paid by Momentum Freight," the parties did not anticipate "any BWC COVID-Pandemic-stimulus money when they entered the APA." (Appellants' Brief at 18.) Appellants claim the $257,999.32 check was "Covid-stimulus money" and assert that section 1.2.7 of the APA was "ambiguous as to whether the 'excluded assets' would include COVID-Pandemic-stimulus money." (Appellants' Brief at 18-19.)

{¶ 29} Initially, we look to the four corners of the APA to determine whether the phrase "Workers' Compensation premium dividend reimbursement, for the [2019] Policy Period" was ambiguous. (Compl. Ex. A, APA § 1.2.7.) The word "premium" in this context refers to "[t]he amount paid at designated intervals for insurance; esp., the periodic payment required to keep an insurance policy in effect." *Black's Law Dictionary* 1430 (12th Ed. 2024). Black's Law Dictionary defines the word "dividend" as "[a] portion of a company's earnings or profits distributed pro rata to its shareholders, usu. in the form of cash or additional shares." *Black's Law Dictionary* 601 (12th Ed. 2024). Merriam-Webster's Collegiate Dictionary defines the term "dividend" as "a share in a pro rata distribution (as of profits) to stockholders" and as "a share of surplus allocated to a policyholder in a participating insurance policy." *Merriam-Webster's Collegiate Dictionary* 366 (11th Ed. 2003). The term "reimbursement" is defined as "[t]he act or an instance of paying back a sum of money." *Black's Law Dictionary* 1541 (12th Ed. 2024). *See also Merriam-Webster's Collegiate Dictionary* 1049 (11th Ed. 2003) (defining "reimburse" as "to pay back to someone").

{¶ 30} Thus, giving the words in section 1.2.7 of the APA their plain and ordinary meaning, the section demonstrated Benie would provide to Momentum any amount of surplus the BWC paid back to Momentum for the premiums Momentum paid during the 2019 policy period. The term "reimbursement" referred to the BWC's act of paying funds back to policyholders, while the term "dividend" demonstrated the amount reimbursed could be any amount of surplus or profits the BWC decided to distribute. To interpret section 1.2.7 as limiting the amount Momentum could receive to only the amount Momentum paid in to the BWC as premiums would require us to delete the word "dividend" from the section. As noted, we must give effect to all words used in a contract and may not

delete words from the agreement. *Cleveland Elec. Illuminating Co.*, 37 Ohio St.3d at 53. Because section 1.2.7 is unambiguous, we must apply the plain language of the agreement as written. Accordingly, appellants' dispute resolves to whether the $257,999.32 BWC check was a premium dividend reimbursement for the 2019 policy period, or whether the check was COVID-stimulus money as appellants contend.

{¶ 31} Initially, we believe it may be helpful to explain how Ohio's workers' compensation system operates. "Pursuant to R.C. 4123.29(A), the administrator of the BWC, with the approval of the board of directors, classifies occupations or industries with respect to degree of hazard and risks and sets the premiums that employers must pay into the state insurance fund for workers' compensation coverage each year." *Cleveland v. Ohio Bur. of Workers' Comp.*, 2020-Ohio-337, ¶ 4. The BWC deposits the employer premiums "into a single state insurance fund (it does not maintain a separate account for each employer), and it pays compensation benefits associated with work-related accidents from that fund." *Id.* R.C. 4123.321 "requires the BWC to establish a procedure for returning excess premiums to participating employers in order to maintain a revenue-neutral fund." *Id. See* R.C. 4123.321 (providing that in the event there is a "surplus of earned premium over all losses" in the state insurance fund the board "may return such excess surplus to the subscribers to the fund"). The BWC board of directors has "full discretion and authority" to determine "whether there is an excess surplus of premium; whether to return the excess surplus to employers; the nature of the cash refunds or reduction of premiums;" and "any other issues involving cash refunds or reduction of premiums due to an excess surplus of earned premium." Adm.Code 4123-17-10.

{¶ 32} The parties presented the affidavit of Michele Wedemeyer, a financial manager for the BWC, as a joint exhibit at trial. Ms. Wedemeyer explained the BWC "offered up to three (3) policy holder dividend payments" to private employers during the calendar year 2020. (Trial Ex. LL, Wedemeyer Aff. at ¶ 3.) The BWC issued the first policyholder dividend payment in "the Spring of 2020 (the 'Spring Dividend')" and issued "most of these first policy holder dividend payments to eligible employers in April 2020." (Trial Ex. LL, Wedemeyer Aff. at ¶ 5.) To qualify for the Spring Dividend, the employer had to satisfy certain criteria, including that the employer reported payroll and was billed premium for the 2018 policy period. The amount of the Spring Dividend was "100% of the

billed premium paid by the employer during the 2018 policy year." (Trial Ex. LL, Wedemeyer Aff. at ¶ 8.) The letter that accompanied the Spring Dividend stated the BWC was issuing a "dividend of up to $1.6 billion to Ohio's private and public employers, a move on [the BWC's] part to ease the financial pressures your organization may be experiencing amid the COVID-19 pandemic." (Trial Ex. JJ.) Momentum received a dividend check from the BWC in the amount of $38,884.83 on April 21, 2020.

{¶ 33} The BWC issued the second policyholder dividend payment in the "Fall of 2020 (the 'Fall Dividend')" and issued "most of the second policy holder dividend payments to eligible employers in October 2020." (Trial Ex. LL, Wedemeyer Aff. at ¶ 9.) To qualify for the Fall Dividend, the employer had to satisfy certain criteria, including that the employer reported payroll and was billed premium for the 2019 policy period. The amount of the Fall Dividend was "100% of the billed premium paid by the employer during the 2019 policy year." (Trial Ex. LL, Wedemeyer Aff. at ¶ 11.) The FAQs the BWC issued with the Fall Dividend stated the BWC was issuing a "dividend of up to $1.5 billion to ease the financial pressures your organization may be experiencing amid the coronavirus (COVID-19) pandemic." (Trial Ex. E.) As noted, the BWC initially issued a dividend check in the amount of $69,269 to Benie on October 22, 2020, but reversed and reissued the check in December of 2020 because Benie lost the check.

{¶ 34} The BWC issued the third policyholder dividend payment "in the Winter of 2020 (the 'Winter Dividend')" and issued most of the "third policy holder dividend payments to eligible employers in December 2020." (Trial Ex. LL, Wedemeyer Aff. at ¶ 12.) To qualify for the Winter Dividend the employer had to satisfy the same criteria applicable for the Fall Dividend. The amount of the Winter Dividend was "3.7246 times the billed premium paid by the employer during the 2019 policy year." (Trial Ex. LL, Wedemeyer Aff. at ¶ 14.) The FAQs issued with the Winter Dividend stated the BWC was issuing the "third dividend this year" to help "ease the financial pressures your organization may be experiencing amid the coronavirus (COVID-19) pandemic." (Trial Ex. G.)

{¶ 35} Appellants claim the $257,999.32 check was COVID-stimulus money because the letter that accompanied the check indicated the BWC issued the check to " 'keep[] businesses open and people employed' " during the pandemic. (Appellants' Brief at 18, quoting Trial Ex. O.) However, the letters and FAQs that accompanied each dividend

check the BWC issued in 2020 stated the BWC issued the checks to help businesses during the COVID-19 pandemic. Notably, although the FAQs that accompanied the $69,269 dividend check specifically stated the BWC issued the check to help "ease the financial pressures your organization may be experiencing amid the coronavirus (COVID-19) pandemic," appellants have not attempted to classify the $69,269 dividend check as COVID-related stimulus money. (Trial Ex. E.)

{¶ 36} The Spring, Fall, and Winter dividends the BWC issued in 2020 were all policyholder dividend payments calculated based on the premiums employers paid during the applicable policy periods. The letter which accompanied the $257,999.32 dividend check repeatedly stated the check was a "dividend" from the BWC, and explained that the "dividend, [the BWC's] third this year, was made possible by our investment returns, prudent fiscal management, and the good work of employers who pay their BWC premiums and look out for the health and safety of their employees." (Trial Ex. O.) Thus, while easing the financial strain businesses were experiencing due to the COVID-19 pandemic may have motivated the BWC to issue each dividend, the BWC was able to issue the dividends due to the amount of surplus funds in the state insurance fund.

{¶ 37} The BWC calculated the amount of both the $69,269 and $257,999.32 dividend checks based on the amount of premiums Momentum paid during the 2019 policy period. Accordingly, both the $69,269 and $257,999.32 dividend checks were BWC premium dividend reimbursements for the 2019 policy period. As such, the APA required Benie to provide both amounts to Momentum in a timely fashion. Because Benie did not provide either amount to Momentum, Benie breached the APA.

{¶ 38} Based on the foregoing, we overrule appellants' first assignment of error.

## IV. Third Assignment of Error—Piercing the Corporate Veil

{¶ 39} For ease of analysis, we address appellants' third assignment of error next. In their third assignment of error, appellants contend the trial court erred by allowing Momentum to pierce Benie's corporate veil.

{¶ 40} Corporations are generally considered distinct legal entities and corporate shareholders and officers are not liable for the debts of the corporation. *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Co.*, 67 Ohio St.3d 274, 287 (1993). An exception to the general rule, known as piercing the corporate veil, was developed "in equity

to protect creditors of a corporation from shareholders who use the corporate entity for criminal or fraudulent purposes." *Id.* at 287. The phrase "[p]iercing the corporate veil" refers to the " 'judicial act of imposing personal liability on otherwise immune corporate officers, directors, or shareholders for the corporation's wrongful acts.' " *Minno v. Pro-Fab, Inc.*, 2009-Ohio-1247, ¶ 8, quoting *Black's Law Dictionary* 1184 (8th Ed. 2004). Piercing the corporate veil is not an independent cause of action; rather, " 'it is a remedy encompassed within a claim.' " *RCO Internatl. Corp. v. Clevenger*, 2008-Ohio-6823, ¶ 11 (10th Dist.), quoting *Geier v. Natl. GG Industries, Inc.*, 1999 Ohio App. LEXIS 6263 (11th Dist. Dec. 23, 1999).

{¶ 41} In *Belvedere*, the Supreme Court of Ohio established the following three-part test for courts to apply when deciding whether to pierce the corporate veil:

> (1) whether control over the corporation by those to be held liable was so complete that the corporation had no separate mind, will, or existence of its own, (2) [whether] control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) [whether] injury or unjust loss resulted to the plaintiff from such control and wrong.

*Belvedere* at paragraph three of the syllabus.

{¶ 42} All three prongs of the *Belvedere* test must be met for piercing to occur. *Dombroski v. WellPoint, Inc.*, 2008-Ohio-4827, ¶ 18. "Because '[o]ne of the purposes of incorporation is to limit the liability of individual shareholders,' the party seeking to have the corporate form disregarded bears the burden of proof." *RCO Internatl. Corp. v.* at ¶ 10, quoting *Univ. Circle Research Ctr. Corp. v. Galbreath Co.*, 106 Ohio App.3d 835, 840 (8th Dist. 1995). Piercing the corporate veil "remains a 'rare exception,' to be applied only 'in the case of fraud or certain other exceptional circumstances.' " *Dombroski* at ¶ 17, quoting *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003). Whether the three-part *Belvedere* test has been satisfied is primarily an issue for the trier of fact to resolve; "a reviewing court will examine the record 'for competent, credible evidence to support the decision of the trial court.' " *Siva v. 1138 LLC*, 2007-Ohio-4667, ¶ 11 (10th Dist.), quoting *Robert A. Saurber Gen. Contractor, Inc. v. McAndrews*, 2004-Ohio-6927, ¶ 26 (12th Dist.).

### 1. Alter Ego

{¶ 43} The first prong of the *Belvedere* test "is a concise statement of the alter ego doctrine; to succeed a plaintiff must show that the individual and the corporation are fundamentally indistinguishable." *Belvedere* at 288. Courts consider the following non-exhaustive factors to determine whether the corporation was the alter ego of its shareholders: grossly inadequate capitalization, failure to observe corporate formalities, the absence of corporate records, the insolvency of the debtor corporation at the time the debt was incurred, shareholders holding themselves out as personally liable for certain corporate obligations, diversion of corporate funds or property for personal use, and whether corporate funds were commingled with personal funds. *Sanderson Farms, Inc. v. Gasbarro*, 2004-Ohio-1460, ¶ 26 (10th Dist.); *Springfield v. Palco Invest. Co.*, 2013-Ohio-2348, ¶ 84 (2d Dist.). *See Sanderson Farms, Inc.* at ¶ 31 (finding the first prong of the *Belvedere* test satisfied because the defendants "disregarded corporate formalities, dominated and controlled the corporations, and diverted corporate funds for personal use").

{¶ 44} The trial court found the Dawsons operated Benie as their alter ego "with control over the corporation so complete that Benie had no separate mind, will, or existence of its own." (Mar. 19, 2024 Decision & Entry at ¶ 121.). The trial court found Benie was grossly undercapitalized upon formation, corporate formalities were routinely ignored, and that corporate funds were routinely commingled with the Dawsons' personal funds. The court noted the Dawsons "fail[ed] to document alleged loans" they provided to Benie and that the Dawsons routinely used their own "personal credit . . . for business purposes with no documentation or explanation." (Mar. 19, 2024 Decision & Entry at ¶ 120.)

{¶ 45} Benie was incorporated as a domestic corporation on June 1, 2020. Benie had only $500 in its bank account when it began operating as a FedEx delivery business on August 29, 2020. Elizabeth admitted that even having $4,000 in Benie's bank account would be insufficient to operate the business. (Tr. Vol. 1 at 135.) Accordingly, the record demonstrated Benie was grossly undercapitalized upon formation.

{¶ 46} Benie's corporate bylaws required that it hold annual shareholder and board of directors meetings. The bylaws also permitted special shareholder and/or board of directors meetings to be called "for any purpose or purposes permitted by law." (Trial Ex.

HH, Art. 2, § 1, 2; Art. 3, § 5, 6.) The bylaws required the company's secretary to maintain "a book of minutes of all meetings of directors and shareholders," documenting the "time and place of holding of all meetings; whether regular or special," and an "account of the proceedings" at each meeting. (Trial Ex. HH, Art. 4, § 4.) The Dawsons affirmed Benie did not hold any formal shareholder or board of directors meetings and that it did not maintain minutes of any meetings. Although Elizabeth claimed she and Russell would hold informal "board member meetings" over "meals" or on the phone "while [Russell] was driving a FedEx truck," she explained that any notes from such meetings would have been written on a "sticky note and then toss[ed] it when [they were] done." (Tr. Vol. 1 at 160, 167.) Russell affirmed corporate "formalities were not kept up like they should have been." (Tr. Vol. 2 at 250.) Accordingly, the record demonstrated the Dawsons failed to observe corporate formalities and failed to maintain corporate records.

{¶ 47} For nearly every month that Benie was in operation, Benie made regular lump sum payments of $10,000 from its business bank account to the Dawsons' personal bank account. The Dawsons both claimed the $10,000 payments were their "payment for work." (Tr. Vol. 1 at 154; Tr. Vol. 2 at 236.) Benie's bylaws stated that, "[s]ubject to contractual agreements approved by the boards of directors, officers of the corporation shall . . . receive salary and benefits as may be approved by the board." (Trial Ex. HH, Art. 4, § 1.) The Dawsons did not produce any contractual agreements, approved by Benie's board of directors, detailing their approved salaries. As such, the lump sum payments of $10,000 from Benie to the Dawsons appeared to be a diversion of corporate funds for personal use.

{¶ 48} The record demonstrated the Dawsons were "constantly using personal credit cards on Benie business." (Tr. Vol. 2 at 267.) Elizabeth noted the Dawsons had to use personal credit cards to operate Benie because they "couldn't get enough credit for Benie to take care of Benie's business needs." (Tr. Vol. 1 at 163-64.) The Dawsons also made "significant payments . . . from Benie's business account to [their] personal credit card accounts." (Tr. Vol. 1 at 161.) Indeed, Russell affirmed Benie paid "tens of thousands of dollars" to his "personal credit card" every "month." (Tr. Vol. 2 at 240.) Although Russell claimed some of his personal credit cards were "dedicated to Benie for only Benie expenses," he acknowledged that at least one of his personal credit cards contained charges

related to both Benie's business and his personal expenses. (Tr. Vol. 2 at 197-98, 238.) Accordingly, the Dawsons made themselves personally liable for corporate debts by using their personal credit cards for Benie's business, and the Dawsons diverted corporate funds for personal use by using Benie's resources to pay off their personal credit cards.

{¶ 49} The Dawsons owned or were officers in other FedEx delivery businesses, known as Red Logistics, Khoda, and Titus. Elizabeth affirmed "significant sums of money [were] being paid to Benie from Red Logistics, Khoda and Titus," and that Benie was "pay[ing] back[]" significant sums of money to these entities as well. (Tr. Vol. 1 at 146, 148.) The Dawsons also made "substantial financial investments" of their own personal money in Benie. (Tr. Vol. 1 at 142.) Although the Dawsons claimed the funds they and their affiliated entities provided to Benie were all "loans," the Dawsons affirmed there were no written loan agreements documenting any of the terms of the alleged loans. (Tr. Vol. 1 at 142-43, 146; Tr. Vol. 2 at 233.) Russell explained he would "just move money back and forth between the [bank] accounts" as "needed." (Tr. Vol. 2 at 233.)

{¶ 50} Appellants contend Trial Exhibit Y documented the "loans" Benie received "from its owners." (Appellants' Brief at 31.) However, Russell admitted the Dawsons prepared Exhibit Y after the "initiation of th[e] lawsuit." (Tr. Vol. 2 at 194.) Exhibit Y does not depict any loan agreements between the Dawsons and Benie; rather, the exhibit depicts a list of credit cards with amounts written next to each card. (Trial Ex. Y.) The exhibit indicates the amount placed on some of the credit cards was "allocated to Benie & Red [Logistics] per analysis," but does not explain how much was allocated to each entity. (Trial Ex. Y.) Accordingly, the trial court did not err by finding the evidence demonstrated the Dawsons "fail[ed] to document alleged loans." (Mar. 19, 2024 Decision & Entry at ¶ 119.) The substantial sums of money the Dawsons moved back and forth between themselves, Benie, and their affiliated businesses without any written loan agreements or other documentation demonstrated the Dawsons routinely commingled corporate funds and personal funds.

{¶ 51} Accordingly, competent, credible evidence supported the trial court's conclusion that Benie was undercapitalized upon formation, failed to observe corporate formalities, failed to maintain corporate records, and that the Dawsons held themselves out as personally liable for corporate expenses and regularly commingled corporate funds and

personal funds.  As such, the record supported the trial court's conclusion that Benie was the alter ego of the Dawsons, with no separate mind, will or existence of its own.

### 2.  Fraud or Illegal Act

{¶ 52}  In *Dombroski*, the Supreme Court stated that "[t]o fulfill the second prong of the *Belvedere* test, the plaintiff must demonstrate that the defendant shareholder exercised control over the corporation in such a manner as to commit fraud, an illegal act, or a similarly unlawful act." *Dombroski*, 2008-Ohio-4827, at syllabus.  The trial court found the second element of the *Belvedere*/*Dombroski* test satisfied in the present case because the Dawsons operated Benie "in order to defraud and steal from [Momentum] by transferring the $69,269.00 and $257,999.32 payments from the [BWC] which contractually Benie owed to [Momentum]." (Mar. 19, 2024 Decision & Entry at ¶ 122.)

{¶ 53}  The trial court found appellants committed civil theft of the $69,269 BWC dividend check in violation of R.C. 2307.60 and 2913.02(A)(2).  R.C. 2307.60(A)(1) provides that "[a]nyone injured in person or property by a criminal act has, and may recover full damages in, a civil action unless specifically excepted by law."  Proof of an underlying criminal conviction is not required to maintain an action under R.C. 2307.60.  *Buddenberg v. Weisdack*, 2020-Ohio-3832, ¶ 11.  R.C. 2913.02(A)(2) defines the criminal offense of theft, providing that "[n]o person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services . . . [b]eyond the scope of the express or implied consent of the owner or person authorized to give consent."

{¶ 54}  Throughout the trial the Dawsons admitted that, although section 1.2.7 of the APA obligated them to provide the $69,269 BWC dividend check to Momentum, they never provided the $69,269 to Momentum.  Instead, the Dawsons transferred the $69,269 BWC check amount from Benie's business bank account to Russell's personal bank account in October of 2021.  Accordingly, the record supported the trial court's conclusion that the Dawsons acted with the purpose to deprive Momentum of the $69,269 BWC dividend check when they knowingly obtained the funds and exerted control over them beyond the scope of the consent given to them under the APA.  The Dawsons theft of the $69,269 constituted to an illegal act under the second prong of the *Belvedere*/*Dombroski* test. *See Kurtz Bros. v. Ace Demo, Inc.*, 2014-Ohio-5184, ¶ 35 (11th Dist.) (noting the plaintiff

"satisfied its duty to allege [the defendant] committed an illegal act" under the second prong of the *Belvedere/Dombroski* test because the plaintiff "alleged facts supporting a criminal offense of theft").

{¶ 55} The trial court also found the Dawsons committed a fraudulent transfer with respect to both the $69,269 and $257,999.32 BWC dividend checks. "Disposing of assets in violation of the [Ohio Uniform Fraudulent Transfer Act] has been found to satisfy" the second prong of the piercing the corporate veil test. *William E. Weaner & Assocs., LLC v. 369 West*, 2020-Ohio-48, ¶ 55 (2d Dist.). *See Flagstar Bank, FSB v. Sellers*, 2010-Ohio-3951, ¶ 23 (12th Dist.) (concluding that "systematically disposing" of corporate assets "in violation of the Ohio Uniform Fraudulent Transfer Act . . . fulfill[ed] the second prong of the piercing the corporate veil test"); *Stewart v. R.A. Eberts Co.*, 2009-Ohio-4418, ¶ 25 (4th Dist.) (noting the "defendant shareholders, acting through the defendant corporations, committed 'fraud and illegal acts' in the form of fraudulent transfers when they transferred and disposed of assets and liabilities with the intent to hinder, delay or defraud Stewart as a creditor").

{¶ 56} Ohio's Uniform Fraudulent Transfers Act, contained in R.C. Chapter 1336, provides that a debtor's transfer of assets is fraudulent as to a creditor if the debtor made the transfer with "actual intent to hinder, delay, or defraud any creditor of the debtor." R.C. 1336.04(A)(1). *See Hanamura-Valashinas v. Transitions by Firenza, LLC*, 2020-Ohio-4888, ¶ 34 (11th Dist.). To determine whether a debtor acted with actual intent to defraud under R.C. 1336.04(A)(1), a court should consider all relevant factors, including the following factors in R.C. 1336.04(B):

> (1) Whether the transfer or obligation was to an insider;
>
> (2) Whether the debtor retained possession or control of the property transferred after the transfer;
>
> (3) Whether the transfer or obligation was disclosed or concealed;
>
> (4) Whether before the transfer was made or the obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) Whether the transfer was of substantially all of the assets of the debtor;
>
> (6) Whether the debtor absconded;

(7) Whether the debtor removed or concealed assets;

(8) Whether the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) Whether the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) Whether the transfer occurred shortly before or shortly after a substantial debt was incurred;

(11) Whether the debtor transferred the essential assets of the business to a lienholder who transferred the assets to an insider of the debtor.

The R.C. 1336.04(B) factors are "commonly referred to as 'badges of fraud.' " *Gevedon v. Ivey*, 2003-Ohio-6521, ¶ 10 (2d Dist.).

{¶ 57} The trial court determined the evidence established the following badges of fraud in the present case: the Dawsons were insiders of Benie, the Dawsons did not disclose the transfer of the BWC funds, the transfer occurred after Momentum filed suit against Benie, Benie was insolvent when the transfer occurred, and the transfer consisted of substantially all of Benie's assets. The trial court also found "clear and convincing evidence of [the Dawsons'] intent to hinder, defraud and delay [Momentum] from obtaining those funds" because the Dawsons admitted they transferred the funds "to avoid creditors of Benie obtaining those funds." (Mar. 19, 2024 Decision & Entry at ¶ 110.) The record supports the trial court's findings.

{¶ 58} The Dawsons were the sole shareholders and officers of Benie, so the transfer of the BWC funds from Benie to the Dawsons was a transfer to company insiders. In January of 2021, the Dawsons placed the BWC dividend checks into Benie's business savings account and informed Momentum the checks had been "deposited into a separate interest-bearing account" to "ensure Benie Logistics complie[d] with the terms of the APA." (Trial Ex. M.) The Dawsons did not inform anybody when they subsequently transferred the funds from Benie's business savings account to their personal bank accounts in October of 2021. As such, the Dawsons led Momentum to believe the funds had been safeguarded in a separate account and then transferred the funds to themselves without disclosing the transfer. Benie's registered agent received service of the complaint in the present case on

September 14, 2021, and the Dawsons transferred the BWC funds on October 5, 2021. Accordingly, the transfer occurred after Benie had been sued.

{¶ 59} The Dawsons both acknowledged that the transfer of the BWC funds to themselves in October of 2021 transferred substantially all of Benie's remaining assets. (Tr. Vol. 1 at 137-38; Tr. Vol. 2 at 222.) Elizabeth agreed that, in October of 2021, "Benie [was] not able to pay all of its debts as they c[a]me due." (Tr. Vol. 1 at 126.) *See* R.C. 1336.02(A)(2) (stating "[a] debtor who generally is not paying his debts as they become due is presumed to be insolvent"). Russell affirmed Benie was "basically insolvent" as of October 5, 2021. (Tr. Vol. 2 at 220.) Accordingly, the record demonstrated Benie was insolvent when the Dawsons transferred the BWC funds to their personal bank accounts.

{¶ 60} Elizabeth stated the Dawsons transferred the BWC funds from Benie's bank account to their personal bank accounts because Benie's Chase Bank business credit card was "extremely, extremely over maxed," and the Dawsons were concerned Chase Bank "would most likely start taking the money automatically out of the [bank] account" to pay the credit card debt. (Tr. Vol. 1 at 123.) Thus, Elizabeth affirmed she moved the BWC funds to "avoid having those creditors access those funds." (Tr. Vol. 1 at 124.) Russell affirmed Momentum was a creditor of Benie in October of 2021, at least with respect to the $69,269 BWC dividend check amount. Elizabeth explained that when she transferred the BWC funds to Russell's personal account, she made the preferential decision to pay Russell back over Benie's other creditors. (Tr. Vol. 1 at 123-24, 147.)

{¶ 61} Accordingly, based on the demonstrated badges of fraud and the Dawsons' admitted intent to transfer the BWC funds to prevent their creditors from obtaining those funds, competent, credible evidence demonstrated the Dawsons transferred the BWC funds with actual intent to hinder, delay, or defraud Momentum. Accordingly, the record demonstrated the Dawsons exercised their control over Benie in such a manner as to commit a fraudulent transfer. As such, the trial court properly found the second element of the *Belvedere/Dombroski* test satisfied in the present case.

### 3. Injury or Loss

{¶ 62} By diverting the total amount of the two BWC dividend checks from Benie's bank account to their personal bank accounts in October of 2021, the Dawsons liquidated Benie and made it impossible for Momentum to recover the BWC funds from Benie.

Accordingly, the record demonstrated Momentum suffered damages in the amount of $327,268.32 ($69,269 plus $257,999.32), as a result of the Dawsons control and wrongful conduct of Benie. *See Pottschmidt v. Klosterman*, 2006-Ohio-6964, ¶ 43 (9th Dist.) (finding the final element of the *Belvedere* test satisfied because the "transfer of all of the original corporation's assets to the new corporation . . . left the original corporation simply an empty shell and made it impossible for Dr. Pottschmidt to collect the judgment rendered in his favor").

{¶ 63} Based on the foregoing, we find competent, credible evidence supported the trial court's decision to pierce the corporate veil of Benie and hold the Dawsons personally liable for Benie's wrongful acts. Therefore, we overrule appellants' third assignment of error.

## V. Second, Fourth, and Fifth Assignments of Error—Tort Claims

{¶ 64} In their second, fourth, and fifth assignments of error, appellants contend the trial court erred by finding in Momentum's favor on its claims for fraudulent transfer, civil theft, and civil conspiracy. Appellants claim the economic loss rule barred each of Momentum's tort claims. As such, we address these assignments of error jointly.

{¶ 65} The economic loss rule prevents recovery in tort of damages for purely economic loss. *Santagate v. Pennsylvania Higher Edn. Assistance Agency*, 2020-Ohio-3153, ¶ 38 (10th Dist.), citing *Clemens v. Nelson Fin. Group, Inc.*, 2015-Ohio-1232, ¶ 34 (10th Dist.). The rule stems from the principle that, "[i]n the absence of privity of contract between two disputing parties . . . 'there is no * * * duty to exercise reasonable care to avoid intangible economic loss or losses to others that do not arise from tangible physical harm to persons and tangible things.' " *Floor Craft Floor Covering v. Parma Community Gen. Hosp. Assn.*, 54 Ohio St.3d 1, 3 (1990), quoting Prosser & Keeton, Law of Torts, § 92, at 657, (5th Ed. 1984). " '[W]hen the promisee's injury consists merely of the loss of his bargain, no tort claim arises because the duty of the promisor to fulfill the terms of the bargain arises only from the contract.' " *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 45 (1989), quoting *Battista v. Lebanon Trotting Assn.*, 538 F.2d 111, 117 (6th Cir. 1976).

{¶ 66} Accordingly, " 'the existence of a contract action * * * excludes the opportunity to present the same case as a tort claim.' " *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.*,

115 Ohio App.3d 137, 151 (9th Dist. 1996), quoting *Wolfe v. Continental Cas. Co.*, 647 F.2d 705, 710 (6th Cir. 1981). A tort claim may exist, however, " 'if the breaching party also breaches a duty owed separately from that duty created by the contract, that is, a duty owed even if no contract existed.' " *Homewood Homes, Inc. v. Helwig*, 2009-Ohio-1699, ¶ 13 (10th Dist.), quoting *Prater v. Three-C Body Shop, Inc.*, 2002 Ohio App. LEXIS 1485, *11 (10th Dist. Mar. 29, 2022). Thus, "where a tort claim alleges that a duty was breached independent of the contract, the economic loss rule does not apply." *Ineos USA, LLC v. Furmanite Am., Inc.*, 2014-Ohio-4996, ¶ 20 (3d Dist.). *Accord Raze Internatl., Inc. v. Southeastern Equip. Co.*, 2016-Ohio-5700, ¶ 62 (7th Dist.).

{¶ 67} "In addition to containing a duty independent of that created by contract, an action arising out of contract which is also based upon tortious conduct must include actual damages attributable to the wrongful acts of the alleged tortfeasor which are *in addition* to those attributable to the breach of contract." (Emphasis in original.) *Textron Fin. Corp.* at 151, citing *Cincinnati Gas & Elec. v. G.E.*, 656 F.Supp. 49, 63 (S.D.Ohio 1986). *Accord Homewood Homes, Inc.* at ¶ 13, citing *Prater* at *11 (noting the evidence "must show damages attributable to the wrongful acts which are in addition to the damages attributable to the breach of contract"); *Ineos USA, LLC* at ¶ 27, citing *Strategy Group for Media v. Lowden*, 2013-Ohio-1330, ¶ 30 (5th Dist.) (stating that, in addition to presenting a separate duty, the tort claim must present "damages separate from those recoverable for a breach" of contract).

{¶ 68} The trial court properly determined the economic loss rule did not bar Momentum's claim for civil theft. The court noted Momentum's claims for conversion and civil theft "allege[d] intentional torts and involve[d] duties, actions and damages that [were] extra-contractual in nature." (June 13, 2023 Decision & Entry at 14.) The "economic-loss doctrine does not apply to intentional torts," because intentional torts necessarily involve duties beyond those created by contract. *Eysoldt v. Imaging*, 2011-Ohio-2359, ¶ 21 (1st Dist.). " '[T]o the extent that a 'theft offense' under R.C. 2913.01 constitutes tortious conduct, it is akin to an intentional tort.' " *Yeager v. U.S. Bank*, 2021-Ohio-1972, ¶ 21 (1st Dist.), citing *Gurry v. C.P.*, 2012-Ohio-2640, ¶ 14 (8th Dist.).

{¶ 69} Accordingly, because Momentum's claim for civil theft amounted to an intentional tort, the claim necessarily involved the breach of a duty separate from any duty

created by the APA. Indeed, while Benie breached the APA by failing to timely forward the BWC dividends to Momentum, the Dawsons committed civil theft in violation of R.C. 2307.61 and 2913.02(A)(2) when they transferred the $69,269 dividend check amount from Benie's bank account to their personal bank accounts and extinguished the funds.

{¶ 70} If a property owner brings a civil action pursuant to R.C. 2307.60(A) "to recover damages from any person who . . . commits a theft offense, as defined in section R.C. 2913.01 of the Revised Code," the property owner may recover the damages specified in R.C. 2307.61. R.C. 2307.61(A). The statute states the property owner "may elect" to recover "[l]iquidated damages" equal to "[t]hree times the value of the property at the time it was willfully damaged or was the subject of a theft offense, irrespective of whether the property is recovered by way of replevin or otherwise." R.C. 2307.61(A)(1)(b)(ii). *See Batsche v. Batsche*, 2024-Ohio-1234, ¶ 48 (12th Dist.) (observing that "[u]nder R.C. 2307.61, it does not matter whether the money was recovered"); *Danceybey v. Dancy-Dunlap*, 2022-Ohio-2774, ¶ 13 (8th Dist.) (stating that "a prevailing plaintiff who has elected treble damages under R.C. 2307.61(A) is entitled to his chosen remedy").

{¶ 71} Pursuant to R.C. 2307.61(A), Momentum elected to recover, and the trial court awarded it, treble damages for the theft of the $69,269 dividend check. Momentum could not have obtained treble damages in its action for breach of contract. *See Atelier Dist.*, 2007-Ohio-7138, at ¶ 60 (noting "[c]ontract damages are intended to place the injured party in the same position it would have been had the contract not been breached"). Accordingly, Momentum's claim for civil theft involved both a separate duty and separate damages from those at issue in the breach of contract action. As such, the economic loss doctrine did not bar Momentum's claim for civil theft.

{¶ 72} Appellants further contend the trial court erred by finding Momentum established its claim for civil theft on the merits. Appellants acknowledge they "owed [Momentum] reimbursement for premiums that [Momentum] paid into BWC," i.e. the $69,269, but claim they "did not steal COVID-Pandemic-stimulus money," i.e. the $257,999.32. (Appellants' Brief at 34.) However, the trial only found appellants committed civil theft with respect to the $69,269.00 dividend check.[2] Because appellants do not

---

[2] The court concluded appellants did not commit civil theft with respect to the $257,999.32 dividend check because it found appellants "genuinely, but mistakenly believed due to the unique circumstances surrounding the issuance of those funds due to Global Health Pandemic that they were the owner" of the

present any argument indicating the trial court erred by finding they committed civil theft with respect to the $69,269 BWC check amount, we overrule appellants' fourth assignment of error.

{¶ 73} The record, however, demonstrates Momentum failed to establish any damages resulting from its claims for fraudulent transfer and civil conspiracy that were separate from the damages resulting from the breach of contract. Indeed, the trial court found Momentum's damages resulting from the fraudulent transfer and the civil conspiracy were "the same as the damages for [Momentum's] claim for breach of contract," and the court stated the damages for both claims "merge[d]" with Momentum's breach of contract damages. (Mar. 19, 2024 Decision & Entry at ¶ 114, 148.) Accordingly, because Momentum failed to establish any damages for its fraudulent transfer or civil conspiracy claims beyond the damages resulting from the breach of contract, the economic loss rule barred both claims. *See Textron Fin. Corp.* at 151; *Homewood Homes, Inc.*, 2009-Ohio-1699, ¶ 13. As such, we sustain appellants' second and fifth assignments of error.

{¶ 74} However, our holding in this regard presents no basis on which to reverse the trial court's judgment. The trial court entered judgment against Benie and the Dawsons, jointly and severally, for the damages resulting from the breach of contract and civil theft. Thus, while we agree the economic loss doctrine barred Momentum's claims for fraudulent transfer and civil conspiracy, because the trial court did not award any damages attributable to these claims, there is no aspect of the court's judgment which needs to be reversed. *Compare Hassey v. Columbus*, 2018-Ohio-3958, ¶ 33 (10th Dist.), citing *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96 (1990) (noting a "reviewing court will not reverse a correct judgment merely because a trial court relied on an erroneous reason as the basis for its determination").

## VI. Conclusion

{¶ 75} Having overruled appellants' first, third, and fourth assignments of error, and having sustained appellants' second and fifth assignments of error which do not warrant

---

$257,999.32 check. (Mar. 19, 2024 Decision & Entry at ¶ 131.) *See State v. Hubbard*, 2013-Ohio-2735, ¶ 64 (10th Dist.), citing *State v. Cooper*, 2009-Ohio-6275, ¶ 9 (10th Dist.) (noting that "[m]istake of fact is widely recognized as a defense to specific intent crimes such as theft").

reversal of the trial court's judgment, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BOGGS, J., concurs.
LELAND, J., dissents.

LELAND, J., dissenting.

{¶ 76} Being unable to agree with the majority decision's resolution of the Winter Dividend payment under the first assignment of error, I respectfully dissent. Under this assigned error, Benie maintains there is no evidence in the record that the parties "foresaw the issuance of Covid-stimulus money when they entered the APA" on June 1, 2020. (Appellants' Brief at 18.) I agree with the contention of Benie that the Winter Dividend, which was authorized by the BWC in November 2020, i.e., subsequent to the parties' agreement and closing date and earmarked to mitigate the effects of the ongoing pandemic, could not have been contemplated by the parties at the time of the APA. Nor do I view the nature and purpose of the Winter Dividend, although calculated based on a percentage (i.e., 372 percent) of prior-year premiums, as constituting "reimbursement" for past or overpaid premiums but rather pandemic relief to assist employers in "keeping businesses open and people employed." (Trial Ex. O.)

{¶ 77} The stated purpose of the BWC's discretionary decision to award the Winter Dividend was "to ease the financial pressures your organization may be experiencing amid the coronavirus (COVID-19) pandemic." (Trial Ex. G.) In this respect, the BWC indicated "[e]ligibility was based on an employer's status (active, lapsed) with us as of Oct. 2." (Trial Ex. G.) *See also RGT Invests., LLC v. DJ. Steakburgers, LLC*, 2023 U.S. Dist. LEXIS 46473, *28, 29 (S.D.Ohio Mar. 17, 2023) (observing that eligibility for the December 2020 COVID dividend payment issued by the BWC "was tied to an employer's status after October 2, 2020" and noting, under the facts of that case, it was undisputed the plaintiffs-sellers did not operate any businesses or have any employees "as of October 2, 2020, the BWC's effective date for determining employer eligibility for the COVID dividend").

{¶ 78} In the present case, as of October 2, 2020, the parties had already closed on the APA, i.e., Momentum was no longer in operation and had no employees, while Benie at

that time was operating its company with approximately 35 employees and had assumed, as successor, transfer of the workers' compensation policy.  Given the nature, timing, and purpose of the Winter Dividend, i.e., a wholly discretionary payment by the BWC (authorized subsequent to the parties' APA/closing) made with the intent to provide direct financial assistance for active coverage employers to navigate ongoing operations during the COVID-19 pandemic, and construing the language of the APA to effectuate the parties' intent, I would conclude the trial court erred in its determination the Winter Dividend constituted an excluded asset under the terms of the APA.  Because the majority decision does not reach that conclusion, I respectfully dissent.

_____